[S. F. No. 5919. In Bank.—January 13, 1914.]

GEORGE R. ANDREWS, Administrator of the Estate of Ruby Pollard, Deceased, (Substituted in Place of Said Deceased), Respondent, v. VALLEY ICE COMPANY et al., Appellants.

NEGLIGENCE — ACTION FOR WRONGFUL DEATH — ABATEMENT THROUGH DEATH OF PLAINTIFF.—Where a widow brings an action to recover for the wrongful death of her husband, recovers judgment, but dies pending an appeal therefrom, the action does not abate through her death, and her administrator may be substituted in her stead as the party plaintiff.

ID.—ELECTRIC WIRES—WORKMAN COMING IN CONTACT WITH—CONTRIBUTORY NEGLIGENCE.—Where a workman, employed in the construction of a building near wires heavily charged with electricity, brings his ruler in contact with one of the wires and is killed by the shock, while he is acting outside of the scope of his employment and against the orders of his employer, and while he has knowledge that the wires are dangerous and are to be removed before the building can be completed, he is chargeable with contributory negligence.

ID. — EXCUSABLE FORGETFULNESS — CONTRIBUTORY NEGLIGENCE.—Such facts do not bring the case within the rule of temporary, excusable forgetfulness, but rather under the rule that one who places himself in the way of an obvious and well understood peril is guilty

of contributory negligence which bars recovery for his injury or death.

ID.—DANGER FROM ELECTRIC WIRES—PRESUMPTION OF KNOWLEDGE.— The dangers incident to getting near highly charged electric wires is presumed to be familiar to men of average intelligence.

ID.—SAFE PLACE TO WORK—LIMITS TO SPACE ALLOTTED EMPLOYEE.— The duty of an employer to furnish a safe place for his employee to work does not extend to the protection of the employee beyond the limits of the space allotted to him and in which he is ordered to work.

APPEAL from a judgment of the Superior Court of Fresno County. H. Z. Austin, Judge.

The facts are stated in the opinion of the court.

W. G. Van Pelt, F. H. Short, and F. E. Cook, for Appellants.

L. L. Cory, and M. B. Harris & E. M. Harris, for Respondent.

MELVIN, J.—This was originally an action by the wife and minor daughter of Edwin M. Pollard, deceased, to recover damages against the defendants for his death. Prior to the trial the minor died and under stipulation the action was dismissed as to her and continued with Ruby Pollard, her mother, as the only plaintiff. A verdict for the sum of seven thousand five hundred dollars was returned in favor of the said plaintiff and an appeal was taken by the defendants from the judgment based thereon. This court transferred the cause to the district court of appeal, where, upon suggestion that Ruby Pollard had died after the perfecting of the appeal, George R. Andrews, who had been appointed administrator of her estate, was substituted in her stead as the party plaintiff. The district court of appeal sustained the judgment and denied the motion to transfer the cause to this court. The motion was in part based upon the contention that this court alone had jurisdiction to make the order of substitution of a party plaintiff in an appeal of which the supreme court had original jurisdiction. Another ground for the motion was that the action had abated by reason of the death of the plaintiff. This latter contention was correctly held of no

avail upon the authority of *Fowden* v. *Pacific Steamship Co.,*
149 Cal. 153, [86 Pac. 178]. We need not pass upon the
question of the jurisdiction of the district court of appeal to
make the order substituting for the original plaintiff the ad-
ministrator of her estate, because we have ordered the cause
before this court on account of the grave doubt expressed by
a majority of the justices regarding the sufficiency of the evi-
dence to sustain the verdict. While we have no doubt that
the district court of appeal had ample authority in the prem-
ises, we reaffirm the order made by that court and thereby
overcome the objection to its jurisdiction in the matter.

The all-important question upon this appeal is whether or
not the evidence discloses without contradiction such a state
of facts as shows deceased to have been guilty of contributory
negligence sufficient to preclude recovery on the part of his
heirs.

Pollard was employed as a workman on a certain ice house
which was in process of construction by the Valley Ice Com-
pany on the line of the Southern Pacific Railroad in the vicin-
ity of the city of Fresno and near the transmission lines of
the San Joaquin Light & Power Corporation. These lines,
carrying powerful electric currents, passed within a few
inches of the corner of the building. The evidence shows
that Pollard received the deadly shock through a ruler which
he held in his hand, and appellants contend that the accident
occurred while he was acting entirely outside of the necessary
line of his employment, contrary to the instructions of the
foreman under whose orders he worked and after he had been
warned of the danger necessarily incurred in approaching
near to the heavily charged transmission wires.

The building in course of construction was located near,
but slightly at an angle with the street along which the trans-
mission lines were stretched upon poles. The concrete wall
of the building had been erected and the power lines were at
about the same height from the ground as the top of it. The
roof-timbers were in place, resting upon the top of the wall,
and the ceiling of the building, upon which the foreman and
Pollard had been standing while at work just before the acci-
dent, was eighteen inches or two feet lower than the top of
the wall. The gable-end of the roof was open toward the elec-
trically charged wires, but owing to the relative angles of the

building and the wires, the point of nearest approach between them was at the northwesterly corner of the building. This corner, when completed, would have been about eighteen inches from the wires, but the roof extended a foot or more beyond the wall so that the nearest point of the wall itself to the wires was about two and one-half feet or a little more. The only witnesses to the death of Pollard were Gronlund, the foreman, and Stephenson, a fellow workman, and it will be necessary to quote quite copiously from the record to convey any adequate idea of the facts to which they testified. They were both called as witnesses for the plaintiff. Gronlund testified that he took the measurements for the north gable end of the roof and gave Pollard orders to help him cut the corrugated iron and put it in place. Pollard helped the foreman take the measurements. Then Gronlund laid out a piece of the corrugated iron for Pollard to cut. Upon cross-examination he testified as follows: "Q. How did the gable end of this building front, as compared with the main line of the Southern Pacific Railroad that runs by there, which way did it run, the gable on which this corrugated iron was to be placed? A. Well, the building runs parallel with the S. P. road. Q. *Then the end was at right angles with the road, fronting up toward town?* A. Yes sir. Q. And the corrugated iron was to be put on under the roof, was it? A. Yes, sir. Q. On the end of the building, under the roof? A. Yes, sir. Q. How far down was it to come? A. Well, it came down about a foot and a half below the top of the joists. Q. That would be about a foot and a half below the gable, down on to the wall, about a foot and a half? A. Well, three inches below the joists, but the joist is sixteen inches. Q. But you sent him up there, didn't you, and then went up after him, after Mr. Pollard? A. Yes sir. Q. When you got up there, what was Mr. Pollard doing? A. I can't exactly state, but he was picking out some of the iron, material. Q. The material that was to be put on the gable end of the building? A. Yes, sir. Q. Now did you see him commence to put any of that material on the gable end of that building before he was killed? A. No sir. Q. Now after you got up there, what was the first thing that he said to you, or you said to him? A. Well, laying out the first starting point for the work. Q. Well, did you and he make any measurements?

A. Yes sir.   Q. What were the measurements and where did you make them?   A. I took the measurements close to the northwest corner.   Q. And where was Mr. Pollard at the time you were taking the measurements close to the northwest corner?   A. *Well he was about the same place I was, I was hanging on the side of the building, and he was on the top.*   Q. *How close was the wall of the building at that time to these wires?*   A. About two feet and a half.   Q. About two feet and a half.   That would be at the corner?   A. At the wall, yes.   Q. From the wall, about two feet and a half?   A. Yes sir.   Q. Now did you get through with that work and get away from there, the corner?   A. Yes sir.   Q. Where did you go?   A. I went over where the iron laid, and laid out a piece ready to put on.   Q. Now where was Mr. Pollard when you started to go over to lay this iron out?   A. Right there, where we were measuring it.   Q. How far was that from the corner?   A. About five feet.   Q. About five feet?   And at that point how far was he from the wire?   A. Well, it would be about the same, a little more.   Q. A little more than five feet?   Now when you started to take the corrugated iron over, away from the corner, were you and he both through with the measurements?   A. Yes sir.   Q. And what did you say to him as to coming there and getting out the corrugated iron?   A. I told him to come there and cut it as I measured it.   Q. Where would that take him as to the wires, toward them or away from them?   A. Away from them.   Q. Now did you turn around to go over to where you were to cut the iron?   A. Yes sir.   Q. And told him to come with you?   A. Yes sir.   Q. Now then, what was the next thing you saw or heard, about Mr. Pollard?   A. I saw him fall, the next thing I saw him fall.   Q. And that was how long after you turned around, just a moment, or any length of time?   A. I just had time to turn around.   Q. And the last thing you had said to him was to come there and you and he would cut out the corrugated iron?   A. Yes sir.   Q. These measurements were for the purpose of putting the corrugated iron on the wall, were they?   A. Yes sir.   Q. Did they have anything to do with the wires?   I say did the measurements have anything to do with the wires or the distance to the wires from the building?   A. Well, not particularly, no.   Q. Well, I say, were you measuring the distance from the building to the wires, or any-

thing of that kind? A. No sir. Q. And your measurements related, exclusively, then, to the places where you put the corrugated iron on the building? A. Yes sir. Q. And you had finished that work before Mr. Pollard was killed, all the measurements? A. Yes sir. Q. And you had turned and told him to come with you, back to the ceiling of the building to cut the iron? A. Yes sir. Q. That was the last order you gave him, was it? A. Yes sir. Q. Last time you saw him until he was shocked? A. Yes, sir. Q. Did you tell Mr. Pollard whether he was to take the corrugated iron to the corner, or leave it off— A. *Leave the last sheet off.* Q. *You told him to do that, did you, to leave the sheet off?* A. *Yes, sir.* Q. *He was not to put that on until the wires were removed? Is that what you told him?* A. *Yes."* Witness was then taken for further examination by one of counsel for the plaintiff and testified as follows: "Q. Did you tell him that, that you were not going to put the last sheet on until the wires were removed? Were you going to remove the wires? A. Yes sir. Q. Did you know that? A. Yes sir. Q. Who told you that? A. It was necessary to get the building completed. Q. What? A. Get the building completed? Q. You couldn't get the building completed without removing the wires? A. Not altogether. Q. Why? A. Too close. Q. The wires were too close to the building and had to be removed? A. Yes sir. Q. Had anyone told you that, or did you just know that, yourself? A. Oh, I could see it. Q. You could see it, anybody up there could have seen it, that the wires were too close, that you couldn't complete the building without removing them? A. Yes sir." Gronlund further testified upon cross-examination: "Q. Had the roof been put on, the corrugated iron of the roof, had it been put on at that time? A. No sir. Q. How much closer would the roof come to the wires than the corrugated iron on the building, how much closer would it extend? A. About two feet and a half. Q. Were you engaged at all in putting on the roof at that time? A. No sir. Q. Hadn't started on that at all? A. No sir. Q. What you were doing was getting ready to put the corrugated iron on the end of the building, and that was two and one-half feet further away than the roof would be? A. Yes sir, about two or three feet. Q. And you had instructed Mr. Pollard not

to put the piece on next to the corner, on the gable end?
A. Yes sir.'' From this testimony it appears that all of the
measurements had been made before the accident and that
there was no occasion for Pollard to go to the corner and to
use his rule there as he evidently did because it was found by
his side, when his corpse lay on the ground and the rule was
burned and marked with the deadly current that had passed
through it into his body. It is uncontradicted testimony that
Gronlund, after giving orders to Pollard to follow him and
help with the cutting of the metal which was located far be-
yond any possible danger from the electric current, turned
toward the pile of corrugated iron and it was then that Pol-
lard, without necessity and contrary to orders, approached a
place of great danger and extended his ruler within the ma-
lign power of the electric current. But it is argued that the
testimony given by Gronlund at the coroner's inquest contra-
dicts that which is quoted above. The material part of his
testimony before the coroner was as follows: ''As the fore-
man, I instructed Mr. Pollard to put on some iron on the gable
end of the building. I came up there after a while, and took
a measure out to measure a sheet of iron, and was going to
have it cut, and I turned back, from where Mr. Pollard was,
on a platform he had built, to cut that iron, and the same
time, Mr. Pollard turned back the other way, to get some more
measures, and I heard the flash of the fire from the wire. I
turned back and saw the fire all around Mr. Pollard's head,
and before I could step a step, he was half way to the ground.
Q. Now these wires come along this point of the building from
six to ten inches? A. Yes sir. Q. Then you think that Mr.
Pollard was there in the act of taking measurements on this
point? A. Yes sir. Q. Is this rule his? A. Yes sir. Q.
This cut is marked on it—E. P., is that it? A. Yes sir.
Q. Did you ever see this rule before his death? A. I saw the
rule in his hands, but I never noticed it before. Q. Ever no-
tice the burned part before? A. No sir.'' When confronted
with this testimony at the trial he said, by way of explana-
tion: ''I suppose that he was taking measurements, because I
never gave him orders to, and it wasn't necessary.'' We do
not find any serious conflict or indeed any conflict at all be-
tween the testimony of Gronlund at the inquest and that
given at the trial. His statement that Pollard was taking

measurements was an expression of opinion amply justified by the circumstances of the latter's death, but he did not testify to anything at the coroner's inquest in contradiction to the testimony afterward given that there was no necessity for further measurements and that Pollard had been ordered to do work well without the sphere of danger. While the testimony given at the inquest was less full and explicit than that elicited from Gronlund at the trial, both statements may be perfectly true and yet entirely free from inconsistency.

Clark Stephenson, the only other witness who was near Pollard at the moment of the fatality, testified in part as follows: "We were working downstairs on some other business in connection with the ice plant, until about eleven o'clock, and then Mr. Gronlund directed us to go on up there and put this corrugated iron on the gable. . . . He told us to go up on the gable end on the northwest corner of the building, that is, right adjacent where these power lines run. We were to put this corrugated iron on the gable end. The cement comes up to the roof, and then from there up on the gable is corrugated iron; that is, under the roof. None of that corrugated iron had been put on the gable at that time. That part of the roof was not covered yet either, but I think the other part had, a section back. There might have been some twelve or fourteen feet back, or twenty feet, I don't remember just now. There was quite a space left there. When we received these instructions from Mr. Gronlund we went up there to the gable. That was about eleven o'clock in the morning. After we got up there, Mr. Pollard paid attention to the iron, and at that time I think when we had the instructions, Mr. Gronlund said that one of us should take a line with us, Mr. Pollard I think he said didn't have any line, and so I took my line, I was starting a line at that time for the bottom part of this corrugated iron, and Mr. Pollard and Mr. Gronlund were cutting the first sheet next to the corner. This would be the second sheet from the corner. They were fitting the bevel for the roof. Q. And on which side was that of the building? A. That was on the south, or the east side—east. Q. Next to the wires? A. Yes sir. Q. That is what we would call the west side, I think? A. Yes, that is the west side, I am a little changed around. I mean the side next to that power line, next to the Southern Pacific Railroad. The

building was situated along East Avenue, it came corner ways
to East Avenue, and I remember was next to the wires.   Mr.
Pollard and Mr. Gronlund were fitting that first sheet of cor-
rugated iron, and of course I couldn't say what he was doing
exactly.   I was paying attention to this line.   I was striking
a chalk line to make a mark for a point.   I was not paying
attention very much to Mr. Pollard and Mr. Gronlund then.
Mr. Pollard was standing right inside of the rafter, I think,
nearly at the corner of the building.   He was not exactly at
the corner, nearly, within a few feet of it, and I think he was
standing on the inside wall.   Where the joists come there is
the rafter comes up some three or four feet above the wall,
above the top part of the wall, the way the building is made.
He was standing on the portion of the wall that projected up,
I think on the cement wall, but I couldn't just exactly say
what he was doing at that particular time, I was not looking
at him.   I couldn't say whether he had any rule out, or any-
thing of that kind.   I don't know much about the accident.
I wasn't looking at him when the accident occurred.   I was
sideways, about sideways, and I heard this noise, sizzing noise,
that electricity makes when it hits anything.   I looked around
and he was toppling over. . . . Q. Had you seen Mr. Pollard
that morning while you were up on the roof on this gable
making these measurements?   A. I wasn't paying any atten-
tion.   *Yes, Mr. Gronlund and him were making these meas-
urements on this first sheet of iron.*   Q. As you didn't see
him the exact moment when he got his electric shock, you
don't know what it was that he touched, or what touched him?
A. No, I couldn't say as to that.   I couldn't say how he came
in connection with the wires there.   I didn't hear any con-
versation between them just before the accident.   I couldn't
say how Mr. Pollard came in contact with the wires.   These
measurements were being taken to get the slope of the roof,
and the base of the corrugated iron, so that it could be cut
to fit in the gable, to get the bevel.   The measurements they
were taking all pertained to the wall of the gable."   Upon
redirect examination the witness said: "Where Mr. Pollard
was working his body would be five or six feet from the wires,
somewhere along there, I should judge.   If he was bending
over with his face fronting to the interior of the building, his
body would come out very much closer to the wires."   This

testimony is corroborative rather than contradictory of that
given by Gronlund.   That the foreman had turned his atten-
tion to the corrugated iron before the accident appears from
what Stephenson says as well as from Gronlund's statement.
Stephenson could not hear what conversation passed between
the foreman and Pollard.   His testimony therefore does not
contradict the foreman's story that Pollard had been directed
to work far from the zone of danger.   Indeed Stephenson's
testimony is not of great value in placing Pollard just before
the accident, for he said, "I wasn't looking at him just be-
fore the accident occurred."

We are forced to the conclusion, after a careful perusal of
all the evidence, that, even if we fully grant the power of the
jury to reject any part of the testimony of a witness and to
accept any other part, there are no selected portions of the
narratives of these two principal witnesses which will support
the verdict.   No serious attack is made upon their stories,
but as appellants' counsel aptly say, were they discredited as
to any part of their testimony, that would "avail plaintiff
nothing, because there is no other testimony."   Plaintiff's
own counsel, as we have shown in the quotations made above,
brought out by leading questions, in his examination of Gron-
lund, that anybody could have seen that the building could
not be completed without removing the wires.   This statement
from plaintiff's own witness, so elicited, would show that the
deceased, who had worked for years around buildings under
modern conditions, must have known the danger of getting
near highly charged wires.   Dangers from such a source are
presumed to be familiar to men of average intelligence.
(*Shade* v. *Bay Counties Power Co.,* 152 Cal. 12, [92 Pac. 62].)
But in addition to all this we have the testimony of Gronlund,
uncontradicted and emphasized also by the leading questions
of one of plaintiff's counsel, that the last sheet of metal was
not to be placed on that part of the gable end of the roof
nearest the northwest corner of the building until after the
removal of the wires.   Plaintiff having introduced these wit-
nesses and having brought out such statements, which are un-
attacked and uncontradicted, cannot well say that they would
be modified by the other parts of the record which show none
of the circumstances of Pollard's death.   Plaintiff's own
proof was that at the moment of the accident Pollard was
acting outside the scope of his employment and against the

order of his master. While it is most regrettable that temporary forgetfulness or a reckless curiosity hurried him to an untimely death, we cannot, upon the record, find his employer or its codefendant responsible therefor. The rule applicable to this case is well expressed by Thompson in his work on Negligence, as follows: Sec. 5395. "If a servant violates known rules devised and promulgated by the master to promote his safety, and is injured in consequence of such violation, he cannot make his own fault the ground of recovering damages from his master, but must take the consequences of his disobedience, his folly, or his recklessness." Sec. 5396. "The rule is the same in the case where a servant brings an injury upon himself in consequence of violating special or particular orders which he has received in a given juncture; he cannot make his own fault in violating such orders the ground of recovering damages for the injury which he thus brings upon himself."

While undoubtedly it was the employer's duty to furnish a safe place for Pollard to work in, that duty did not extend to his protection beyond the limits of the space allotted to him and in which he was ordered to assist the foreman. (*Kennedy* v. *Chase,* 119 Cal. 638, [63 Am. St. Rep. 153, 52 Pac. 33].)

Nor does the evidence herein bring the cases within the rule of temporary, excusable forgetfulness announced in such cases as *Giraudi* v. *Electric Imp. Co.,* 107 Cal. 125, [48 Am. St. Rep. 114, 28 L. R. A. 596, 40 Pac. 108], and *Jacobson* v. *Oakland Meat etc. Co.,* 161 Cal. 430, [Ann. Cas. 1913B, 1194, 119 Pac. 653]. Rather does it come under the rule that one who places himself in the way of an obvious and well understood peril is guilty of contributory negligence which bars recovery for his injury or death. (*Brett* v. *Frank & Company,* 153 Cal. 270, [94 Pac. 1051]; s. c. 162 Cal. 736, [124 Pac. 437]; *Ergo* v. *Merced Falls Gas & Elec. Co.,* 161 Cal. 335, [41 L. R. A. (N. S.) 79, 119 Pac. 101]; *Bresette* v. *E. B. & A. L. Stone Co.,* 162 Cal. 75, [121 Pac. 312]; *Reynolds* v. *Los Angeles Gas & Elec. Co.,* 162 Cal. 327, [Ann. Cas. 1913D, 34, 39 L. R. A. (N. S.) 896, 122 Pac. 962].)

The judgment is reversed.

Shaw, J., Henshaw, J., Lorigan, J., and Angellotti J., concurred.