[Civ. No. 3354.   Third Appellate District.—November 19, 1927.]

RUTH L. HOWELL et al., Respondents, v. SAN JOAQUIN LIGHT & POWER CORPORATION, Appellant.

Lindsay & Conley and Carl E. Lindsay for Appellant.

Russell & Heid for Respondents.

PLUMMER, J.—This action is prosecuted by Ruth L. Howell as the surviving widow and Eldon B. Howell as the surviving son of J. B. Howell, deceased, whose death is alleged to have been caused through the negligence of the defendant in maintaining an uninsulated highly charged electric wire in too close proximity to the ground on which the deceased was working at the time he met his death.

The record shows that in May, 1920, the defendant erected a power line in the agricultural section of Tulare County over a certain alfalfa field owned by one S. H. Ginder. All the premises involved in this section are agricultural in character and are located about eleven miles southwest of the city of Tulare, in the county of Tulare. The complaint sets forth and the evidence supports the following facts: That prior to the sixth day of November, 1922, the appellant had constructed, and on that day was maintaining a power line, the wires of which were uninsulated, and were carrying approximately 13,000 volts of electricity; that the main line of said company ran along the line of a county road; that the line involved in this action was run from the main power line to a pumping plant over an alfalfa field approximately 200 feet from a certain right-angle turn in the line running from the main line; that at the point where said line turned at right angles, it was supported by a pole which at the time of its construction was held in a perpendicular position and the power line to said pumping plant was held taut and at a fixed distance from the ground by means of a guy-wire extending from the top of the pole to the ground and which said guy-wire was held taut by means of a strut extending from the said pole to said guy-wire; that prior to the sixth day of November, 1922, the strut had fallen from its place above mentioned, and, in so doing, allowed the pole to be drawn over by the wire, and that the pole on which said wire was suspended, after the falling out of said strut, had leaned over to such an extent that the power line was permitted to sag and come nearer to the ground than originally constructed; that the line in question, at the time of the accident, was only 19 feet and 3 inches from the surface of the ground; that on the first day of May, 1922, the Railroad Commission, by its General Order No. 64, had ordered that all construction, reconstruction, and maintenance of overhead electrical supply and signal lines, including power lines, should have a vertical clearance above the ground along streets, roads, highways, and alleys, in rural districts and across areas capable of agricultural development, of at least 25 feet, where such lines carried an electrical energy of 750 volts, up to and including 17,000 volts. It is further alleged in

the complaint that the defendant negligently allowed the strut which supported the pole, to which we have herein referred, in an upright position, to remain out of place and the pole unsupported, and also allowed the supply wire to carelessly and negligently drop lower to the ground than it was when originally constructed. The testimony is to the effect that when originally constructed the wire had a clearance of approximately 23 feet. On the sixth day of November 1922, the deceased, J. B. Howell, who prior to that time had been residing on a dairy ranch about four miles from the premises involved in this action, went to the Ginder place and to the alfalfa field where he met his death, for the purpose of taking up and relaying a certain pipe-line to be used in conveying water from a water-tank on the Ginder place to an adjoining pasture upon which the deceased and Ginder had cattle grazing; that the deceased went to work upon said premises at the hour of about 9 o'clock A. M. in taking up and relaying the pipe-line just referred to, and that on the same day, between the hours of 1 and 2 P. M., the deceased took up a section of the pipe-line 20 feet and 6 inches in length immediately beneath the power line herein mentioned; that in taking up the different sections of the pipe-line referred to, the deceased, and the witness Ginder had raised each section perpendicularly, jounced the same up and down upon a board for the purpose of removing all rust or obstruction that might be within the section of the pipe-line being taken up and relaid; that in taking up the 20-foot section just referred to the deceased in some manner raised it up perpendicularly for the purpose of removing the rust therefrom, in the manner just indicated, and by some means the pipe-line was brought in contact with the uninsulated power wire, and electrocution immediately followed. It further appears from the testimony that on the day that the said J. B. Howell was electrocuted, an employee of the defendant, at the request of Mr. Ginder, had gone to the Ginder ranch to replace a burned-out fuse on the transformer situated on a pole near the pumping plant operated on the Ginder premises. This witness testified that he saw Mr. Howell at work and called to him to be careful in the handling of the water-pipe. The testimony does not show

that the deceased heard this warning, although the witness testified that at the time Howell was distant from him only about 75 feet. On this point there is contradictory testimony, however, as the witness Ginder testified that at the time the employee of the defendant was at work replacing a burned-out fuse on the transformer, Howell was distant some three or four hundred yards. On the part of the defendant it is claimed that the deceased was familiar with the premises. The contrary is maintained by the respondents. The testimony as set forth in the transcript simply shows that the deceased went to the alfalfa field, where he met his death, about 9 o'clock A. M. on November 6, 1922. So far as the record is concerned, there is not a word of testimony showing that the deceased knew anything about the power line, its location; that he had ever seen it, or that he had ever been there preceding the day of his death. The evidence also further shows, without any substantial conflict, that the strut in question which supported the pole where the power line made the right-angle turn, had been out of place for a period of at least two weeks preceding the sixth day of November, and was out of place on the day that the employee of the company was there replacing the burned-out fuse. There is no substantial conflict in the testimony that the wire had also been allowed to droop by reason of the leaning of the pole from its original height of about 23 feet to an elevation above the surface of only 19 feet and 3 inches. Among other witnesses placed upon the witness-stand by the plaintiff was one Carl H. Holley, a consulting engineer, who testified that he had had 23 years' experience in the construction of electrical power plants and systems; that he had had experience with the Yuba Power Company at Marysville; was construction engineer for the Bay Counties Power Company at Colgate; was superintendent and engineer for the Mount Whitney Power Company and later superintendent and engineer for the Tulare Power Company. This witness testified that power lines over lands or fields capable of agricultural development carrying 11,000 volts of electricity should be at least 25 feet in elevation above the surface, and that a greater distance was desirable. This witness gave the height of the line in question, at the time of his measurement

shortly after the accident as 19 feet 2½ inches above the ground, and that the line had been allowed to sag at least 4 feet on account of the leaning over of the pole from which the strut or brace had become misplaced. The strut was a piece of timber 4x4 originally fastened to the post at one end and the other against the guy-wire holding the pole at the right-angle turn in an upright position in such a way as to hold the guy-wire taut. When this strut fell from its position the guy-wire consequently hung loose and no longer supported the pole in its original position.

Over the objection of the defendant the plaintiffs were allowed to introduce in evidence a duly certified copy of General Order No. 64 of the Railroad Commission of the state of California relative to the construction, reconstruction, and maintenance of overhead power lines. The finding and order of the Railroad Commission, as introduced in evidence, is as follows:

"An investigation having been instituted on the Commission's own motion as to the reasonableness of certain proposed uniform standards of overhead line construction, a hearing having been held, and the matter submitted and ready for decision:

"The Railroad Commission of the State of California hereby finds as a fact that the proposed rules and regulations for overhead line construction as modified and set forth in this Commission's general order No. 64, are reasonable and just, and that compliance with the same will result in improved service and greater safety.

"Basing its order on the above finding of fact: it is hereby ordered that:

"(1) All construction, reconstruction and maintenance of overhead electrical supply and signal lines coming within the jurisdiction of this commission, done on and after July 1, 1922, shall conform to the rules of overhead electric line construction prescribed by the Railroad Commission of the State of California in its General Order No. 64.

"(2) General Order No. 64 is hereby approved and ordered effective July 1st, 1922.

"The foregoing opinion and order are hereby approved and ordered filed as the opinion and order of the Railroad Commission of the State of California.

"Dated at San Francisco, California, this 1st day of May, 1922.

> "H. W. Brundige,
> "H. D. Loveland,
> "Irving Martin,
> "Chester H. Rowell,
> "H. S. Benedict,
> > "Commissioners."

In connection with the foregoing there was read in evidence a table referred to in Order No. 64, as follows: "Table 1, case No. 4, Vertical Clearance above the ground of wires along streets, roads, highways, or alleys in rural districts or across areas capable of agricultural development, supply lines, 750–17,000 volts, 25 feet." At the conclusion of plaintiffs' testimony, the defendant moved for a nonsuit on the ground that the testimony showed no negligence on the part of the defendant, and also on the ground that, assuming negligence on the part of the defendant, the testimony established contributory negligence on the part of the deceased. This motion was denied, as, likewise, the motion for a directed verdict. The jury found in favor of the plaintiffs, and upon this appeal it is insisted that there is no evidence of negligence on the part of the defendant; that the deceased was guilty of contributory negligence, and that the order of the Railroad Commission relative to the construction, reconstruction, and maintenance of power lines carrying an energy of between 750 and 17,000 volts had no application to the line in question, although it carried an energy of 11,000 volts, for the reason that the defendant's line was constructed in 1920, and so antedated the order of the Railroad Commission for a considerable period of time. It is further urged in this particular that the order of the Railroad Commission refers only to lines that should be constructed and reconstructed after July 1, 1922, and does not refer to or affect the maintenance of lines which were constructed and in operation prior to the first day of July 1922.

The general order in question was dated May 1, 1922; it became effective on July 1, 1922, sixty days after its promulgation. The electrocution of the deceased occurred on the sixth day of November, 1922, a little over six months after the promulgation of the order. There is no

contention made upon this appeal that a sufficient time had not elapsed to enable the defendant to comply with the order of the Railroad Commission relative to the clearance of power wires carrying a voltage equal to that carried by the line under consideration. The contention is simply that the order of the Railroad Commission did not require any elevation of that line, and that the defendant could in accordance with the order of the commission, continue to maintain said line at the elevation disclosed by the testimony in this case. It is urged that the order of the Railroad Commission had no retroactive effect, and a number of cases are cited by the appellant, holding that acts of the legislature are not to be given a retroactive effect, unless the plain import of the language used necessitates such holding. We agree with the appellant in this contention, that the order of the Railroad Commission did not have any retroactive effect and was not intended to have any retroactive effect, but we differ from the construction placed upon the order of the Railroad Commission by the defendant after July 1, 1922, in that we think the order plainly and directly applies to the maintenance of power lines and supply lines carrying the heavy voltage referred to in the order and that on and after July 1, 1922, the maintenance by the defendant of the power line carrying 11,000 voltage with a clearance of a trifle over 19 feet was in direct disregard of the order of the Railroad Commission. By the order of the Railroad Commission the defendant was allowed sixty days within which to elevate its line, and a period of a little over four months additional expired, with nothing having been done by the defendant to comply with the order of the commission relative to the maintenance of its line. The very word "maintenance" applies as directly to a line already constructed as to one that was thereafter to be constructed or reconstructed. It certainly cannot be reasoned that the Railroad Commission, after finding, upon investigation, that safety required such heavily charged power lines to have a clearance of 25 feet, that it would then proceed to promulgate an order which required such a clearance only of lines thereafter to be constructed, and how they should be maintained after construction in order to insure safety, and then provide that lines already constructed, having a clearance of 6 feet below the point

of safety, might lawfully be maintained. Such a construction leads to the absurdity that a power company across one field might, in accordance with the rules and regulations of the Railroad Commission, maintain a highly charged power line several feet below the line of clearance, which would be unlawful if constructed and maintained across an adjoining field on and after July 1, 1922. Ordinary safety and protection of life and property seem to us to demand that the general order of the Railroad Commission as to the maintenance of power lines so highly charged should apply to all lines maintained so highly charged after the first day of July, 1922. The word "maintenance" cannot be eliminated from the order, nor can it be held that the word "maintenance" applies to one line and not to another, without convicting the Railroad Commission of the absurdity of providing that an instrumentality dangerous in its character could not and should not be lawfully maintained over one field of alfalfa less than with a minimum clearance of 25 feet, while at the same time concluding that such an instrumentality, equally dangerous to life and property, might lawfully be maintained over another field with a clearance of only 19 feet. If reasonable safety requires a clearance of 25 feet over one particular agricultural tract of land, it certainly requires the same clearance over other agricultural tracts of land. That the Railroad Commission had the power to make the order in question appears not to be controverted. We may, however, add that it has such power, and this is clearly shown by the authorities set forth supporting the text in 37 Cyc., page 1636, where the subject of the change, location, etc., of electric wires, is considered. That the word "maintenance," in relation to the future operation and control of electric power lines, as mentioned in Order No. 64 of the Railroad Commission, applied directly to the line maintained by the defendant as well as to lines that should be subsequently constructed, has, in principle, been directly decided in this court in the case of *Morris* v. *Sierra & San Francisco Power Co.*, 57 Cal. App. 281 [207 Pac. 262]. The court in that case, considering the powers of the Railroad Commission as conferred by sections 22 and 23 of article XII of the constitution and the legislation had in pursuance thereof, was dealing with two wires, both of which were

constructed prior to the order of the Railroad Commission, then and there involved. Order No. 26 of the Railroad Commission, among other things, provided that there should be at least a clearance of 2 feet between wires; that this order applied to both the plaintiff and the defendant in that case. The order became effective January 1, 1913. Neither one of the parties to that action took any steps to so adjust their lines as to give the clearance required by the order of the commission. This court held, speaking through Justice Hart, that such failure was "obviously a violation of Order No. 26 above referred to prescribing the minimum clearance between telegraph and telephone wires where the same cross each other," etc. It was held in that case that admitting the negligence of the defendant in not changing its wires to conform to the order of the Railroad Commission, the plaintiff was also guilty of negligence in not so reconstructing and maintaining, after January 1, 1913, the line owned by him so as to give the requisite clearance. The order referred to, which became effective as herein stated, and known as General Order No. 26, so far as applicable here, reads as follows: "Telegraph, telephone and signal lines at crossings with other telegraph, telephone or signal lines shall have a minimum clearance above or below such lines of 2 feet, unless suitably supported to prevent contact." A hearing by the supreme court in that case was denied, and we think the reasoning set forth in the opinion of *Morris* v. *Sierra etc. Power Co., supra,* is conclusive here, and definitely decides that an order of the Railroad Commission, specifying that highly charged power lines, in areas such as that involved here, shall have a minimum clearance of at least 25 feet, and were to be so maintained on and after July 1, 1922, and included all lines then subsisting, as well as lines that should thereafter be constructed in like territory. ▮ Likewise, as held in the case of *Morris* v. *Sierra etc. Co., supra,* and as also held in the case of *Sickels* v. *Mt. Whitney Power & Electric Co.,* 177 Cal. 278 [170 Pac. 599], the failure of the power company to maintain its line carrying 11,000 voltage with a minimum clearance of 25 feet, as provided by the order of the Railroad Commission, and its disregard of the order of the Railroad Commission in this respect, must be held as showing negligence *per se* on the part of the defendant.

Under the constitutional provision to which we have referred, and the acts of the legislature passed in pursuance thereof, the order of the Railroad Commission relative to the lawful manner in which certain power lines could be maintained became obligatory upon the defendant, and this duty appears to have been disregarded by the defendant for a number of months, on the theory that it was not a binding order upon the defendant and did not require the defendant to elevate its line so as to give the clearance found necessary for safety by the Railroad Commission. The evidence shows conclusively that had the line in question been maintained with a clearance equal to that specified in General Order No. 64 of the Railroad Commission, the deceased would not have been electrocuted. The pipe which the deceased had in his hand was 20 feet 4 inches in length. The mark upon the pipe, as testified to by witnesses, where it came in contact with the electric wire, was about 16 or 18 inches from one end thereof, showing clearly that if the wire had been maintained with a clearance of 25 feet, no fatality would have followed. The wire in question was insulated. ■ It was maintained, as we have shown, at an elevation of only 19 feet and 3 inches, and irrespective of the order of the Railroad Commission requiring a clearance of at least 25 feet, the question of maintaining an uninsulated wire so close to the ground over agricultural lands where farmers, workmen, dairymen, and others who might lawfully go there and the agricultural implements which they might use, including water-pipe and other instrumentalities which the farmers of that section were accustomed to use and employ and where contact with the unprotected wire might readily be made, presented a question of fact as to the negligence of the defendant, to be submitted to the jury.

■ The appellant further argues that even though admitting the negligence as alleged in the complaint, the deceased was guilty of contributory negligence, and, therefore, no recovery can be had. No person witnessed the accident. What occurred can only be gathered from the surrounding circumstances. There is nothing in the testimony to show that the deceased had or did not have knowledge of the current being carried by the wire on the sixth day of November, 1922. So far as the testimony shows, it indi-

cates that the deceased went upon the alfalfa field in question for the first time on the day that he met his death. Again, there is nothing indicating that the iron pipe, when held in the hands of the deceased, was or was not blown against the electric wire without any fault on his part. As bearing upon the question of the deceased's alleged contributory negligence, we think the language of the supreme court in the case of *Giraudi* v. *Electric Improvement Co.*, 107 Cal. 120 [48 Am. St. Rep. 114, 28 L. R. A. 596, 40 Pac. 108], applicable. That case involved the question of negligence of the injured person going upon the roof of a building and coming in contact with an electric wire, and the court said: "Even had he observed the wires during his short visit to the roof, it would be a question for the jury to say whether it was the want of ordinary care for him not to have it in mind on that occasion. It is said that if one was aware of the fact, which should have put him upon his guard, he cannot rebut the presumption of contributory negligence by showing that he momentarily forgot it. This is true as a general proposition, but, like all other rules upon this subject, it must have a reasonable construction. To forget is not negligence unless it shows the want of ordinary care, and it is a question for the jury. Illustrations of this proposition are found in the case where brakemen were injured by obstructions over or near the track of a road. They have been allowed to recover, although it is shown that they knew of the obstructions, on the ground that they cannot be expected to retain, at all times, a complete outline of the track, and because in the hurry of their work, they would not be likely to keep these things in mind. That is, to forget, under the circumstances, did not prove absence of ordinary care." (Citing *Dorsey* v. *Phillips Co.*, 42 Wis. 583.)

The case of *Andrews* v. *Valley Ice Co.*, 167 Cal. 12 [138 Pac. 699], cited by the appellant upon the question which we are considering, differs from the case at bar because the deceased in that case was not in the course of his employment, and had been directly and specifically warned not to go to the place where he was injured. The deceased in the case at bar was where he had a right to be, and where the work that he was performing necessitated his being.

Again, in the case of *Shade* v. *Bay Counties Power Co.*, 152 Cal. 10 [92 Pac. 62], relied upon by the appellant, where it is said that ''in an action to recover damages for personal injuries alleged to have been the result of the negligence of the defendant in which the defense of contributory negligence is interposed, if the facts are ·clear and undisputed and no other inference than that of contributory negligence can be drawn from them, the court is not required to submit that question to the jury, but may itself make the inference.'' The facts show that the plaintiff, on a public road, discovered an electric wire hanging down to within a few feet of the ground; that as he approached the wire he was cautioned by a witness in the following language: ''Don't touch the wire, Chester, whatever you do''; and the deceased replied: ''There's no danger of my doing that; I wouldn't think of doing that.'' Nevertheless, the deceased took a short cord, threw it over the wire, and in drawing the wire to one side came in contact with it and received a fatal shock. Even in that case there was a very strong dissenting opinion on whether the question of contributory negligence should or should not have been submitted to the jury. Ordinarily, the language of the court in *Williams* v. *Pacific Electric Co.*, 177 Cal. 235 [170 Pac. 423], applies. It is there said: ''The question of contributory negligence is one of fact for the jury to solve under proper instructions, save in those cases in which, judged in the light of common knowledge and experience, there is a standard of prudence to which all persons similarly situated must conform.'' And as said in section 141, 19 California Jurisprudence, page 735, ''where contributory negligence is set up as a defense, it seldom happens that the question is so clear from doubt that the court can undertake to say, as a matter of law, how the jury shall find upon the issue. As, with the negligence of the defendant, the question of contributory negligence of the plaintiff is ordinarily one of fact for the jury.'' (Citing many authorities.) Under the facts of this case we think the question of contributory negligence was one for the jury and not for the court, and that the finding of the jury thereon, adversely to appellant, as must necessarily be concluded from the verdict, is conclusive upon this appeal.

It is finally urged that the court erred in its instructions given to the jury and in denying certain instructions requested by the appellant. Following the case of *Fairbairn* v. *American River Electric Co.*, 179 Cal. 157 [175 Pac. 637], the trial court, at the request of the plaintiff, gave the following instruction: "If you find from the evidence that it was a common practice in the community where defendant was maintaining the power line involved in this action of persons laying pipe-lines and in laying pipes of standard lengths to stand them up on end for the purpose of cleaning them before laying, then you are instructed that it was the duty of defendant to have ascertained such fact and to have maintained its wires across lands capable of agricultural development and where such pipe-lines were likely to be laid, at such height that there was no likelihood that such pipes would come in contact with its power lines, and if you find that defendant failed in this case to maintain the power line in question according to this requirement, defendant is guilty of negligence and you should so find." This instruction we think inapplicable. The circumstances here disclose no visible objects such as were frequently in evidence in the territory where the American River Electric Company was maintaining its power lines and which was involved in the case just cited. Water-pipes, as shown by the testimony, are taken up only at infrequent intervals. They are not objects visible to anyone visiting the premises in question, nor were there agricultural implements visible, like hay derricks, which are necessarily moved about from place to place where hay is being raised, baled, or stacked. The circumstances are not like maintaining a power line across either a public or a private highway where hay derricks were being moved from field to field. There is no showing in the testimony that water-pipes had ever before been laid under electric power lines. The fact that some of the witnesses testified that it was the usual practice in removing the rust from sections of water-pipe, to stand the same on end, does not bring the situation within the principle involved in the Fairbairn case. The Fairbairn case involved the transportation of large, visible objects, of which anyone may reasonably be said to have knowledge and to take notice. However, we do not think that the jury was misled by the

58

instruction under consideration, and that section 4½ of article VI of the constitution applies. The wire in question, as we have seen, was not maintained in accordance with General Order No. 64 of the Railroad Commission, and was maintained uninsulated with a clearance of 19 feet 3 inches, which was only a trifle more than the length of an ordinary fence board, so that the jury was given ample ground for concluding that the wire was being maintained in a negligent manner, irrespective of whether the company knew anything about the custom of dairymen, when changing pipe-lines, to stand the different sections on end. The wire was so low that contact might be made therewith with many different instrumentalities used on farming lands, so that the instruction objected to, even though inapplicable, was absolutely harmless. ■ Nor did the trial court err in giving plaintiff's requested instruction No. 22, which reads: "If the defendant failed to comply with the order of the Railroad Commission of the State of California relative to the maintenance of the power line in question, such fact is *prima facie* evidence of negligence, and if you believe from the evidence that a failure to comply with said order was the direct and proximate cause of the death of J. B. Howell, and that such death was caused without fault on his part, you are instructed to return a verdict for the plaintiffs." The authorities which we have cited show that failure to comply with the orders of the Railroad Commission in the construction and maintenance of the electric power lines is negligence *per se,* and therefore makes out a *prima facie* case. ■ Complaint is likewise made of the giving of plaintiff's requested instruction No. 14, which reads: "You are instructed that it is the duty of the Defendant-Corporation, after the construction of its power line leading to the pumping plant on the Ginder premises, to use due care and caution to keep said power line in a safe, substantial manner by constant oversight and repair." It is sufficient to say that this instruction was approved in *Robinson* v. *Western etc. Co.,* 184 Cal. 401 [194 Pac. 39], and is substantially the same as the instruction approved by this court in the case of *Tackett* v. *Henderson Bros. Co.,* 12 Cal. App. 658 [108 Pac. 151]. ■ The instructions, as a whole, given by the court, clearly and fairly presented to the jury all the issues involved in this case. As to the

instructions requested by the defendant and refused by the court, an examination shows that they are either inapplicable or contain incorrect statements of the law. Thus, in instruction (A), as so designated in appellant's brief, the question of the negligence of the defendant relative to supporting the pole in a perpendicular position, which had leaned over and allowed the wire to sag, is made to rest upon knowledge acquired by the defendant of the leaning posture of the pole, and omits all reference to the duty of the company to properly inspect its wires to ascertain if they are in a safe condition. Instruction (B) is a modified form of the instruction condemned in the case of *Foley* v. *Northern Power Co.*, 14 Cal. App. 401 [112 Pac. 467]. Instruction labeled (C) is based upon the case of *Andrews* v. *Valley Ice Co.*, 167 Cal. 11 [138 Pac. 699], where the facts were different, and, therefore, even if applicable in that case, is inapplicable here, because of the want of testimony upon which to base such an instruction.

It would serve no useful purpose to summarize the various requested instructions refused by the trial court, and we content ourselves with the statement that those not referred to specifically herein have been examined, and no error in their refusal has been called to our attention. We may say, however, that several of them were requests that the jury should be instructed that no negligence had been shown on the part of the defendant; that contributory negligence on the part of the plaintiff was established; and requests for a directed verdict.

Finding no error justifying a reversal herein, the judgment of the trial court is affirmed.

Hart, J., and Finch, P. J., concurred.

A petition by appellant to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on January 16, 1928.

All the Justices concurred.