[S.F. No. 22846. In Bank. May 17, 1972.]

TAU FAH MARK et al., Plaintiffs and Appellants, v. PACIFIC GAS AND ELECTRIC COMPANY et al., Defendants and Respondents.

COUNSEL

Charles O. Morgan, Jr., and Morgan & Moscone for Plaintiffs and Appellants.

Thomas M. O'Connor, City Attorney, Edward J. Nevin and Michael C. Killelea, Deputy City Attorneys, Richard H. Peterson, Noel Kelly, Bacon, Stone, O'Brien & Hammond, W. C. Bacon and W. F. Stone for Defendants and Respondents.

## OPINION

BURKE, J.—Plaintiffs appeal from a judgment of nonsuit entered by the San Francisco Superior Court at the close of plaintiffs' case in a wrongful death action. Plaintiffs' decedent, Calvin Mark, was electrocuted while attempting to remove or unscrew a light bulb from a street lamp located

outside his apartment bedroom window. Plaintiffs sued, under various theories of liability, Calvin's landlord (Mr. and Mrs. Chase), the City and County of San Francisco ("City"), and Pacific Gas and Electric Company ("PG&E"). We have concluded that although a nonsuit was properly entered in favor of the landlord and City, there was ample evidence to support a jury verdict against PG&E, and that the judgment of nonsuit in favor of PG&E should be reversed.

■ As we have repeatedly held, a nonsuit in a jury case " 'may be granted only when disregarding conflicting evidence, giving to the plaintiffs' evidence all the value to which it is legally entitled, and indulging every legitimate inference which may be drawn from the evidence in plaintiffs' favor, it can be said that there is no evidence to support a jury verdict in their favor.' " (*Grudt* v. *City of Los Angeles,* 2 Cal.3d 575, 586-587 [86 Cal.Rptr. 465, 468 P.2d 825]; *Pike* v. *Frank G. Hough Co.,* 2 Cal.3d 465, 469 [85 Cal.Rptr. 629, 467 P.2d 229]; *Elmore* v. *American Motors Corp.,* 70 Cal.2d 578, 583 [75 Cal.Rptr. 652, 451 P.2d 84].)

Viewed in the light most favorable to plaintiffs, the evidence disclosed the following facts: Calvin and his three roommates moved into the Chases' apartment building in June 1964. At once the boys discovered that the light from a street lamp pole standing adjacent to their bedroom window was so bright that it disturbed their sleep; even with the drapes drawn and room lights extinguished the boys were able to read by the light cast by the street lamp. Calvin and his roommates complained to the Chases regarding the light, and Mr. Chase contacted PG&E which advised him to call City's street and lighting department. Chase did so and the City directed PG&E to examine the lamp. Thereupon a PG&E inspector attempted to reduce the light's glare by partly blackening a portion of the plastic globe or canopy surrounding the bulb; subsequently Chase also blackened part of the globe with aluminum paint. These efforts, however, had no measurable effect in reducing the intensity of the light. The boys themselves called City and PG&E to complain of the matter, but the light remained undiminished in its intensity.

In September 1964 an automobile crashed into the lamp pole, breaking the bulb, knocking the canopy off the top, and bending the pole toward the Chases' apartment building. Although PG&E replaced bulb and canopy, the pole remained unstraightened. In its bent condition, the pole was only 10 inches away from the edge of a fire escape located just outside the bedroom window, and 55 inches from the window itself, thereby making the lamp easily accessible to the occupants of the room. Having received no effective assistance from Chase, City or PG&E, the boys

decided to employ self-help, and from time to time thereafter they extinguished the light simply by removing the plastic canopy and unscrewing the bulb. The boys were able to unscrew the bulb without incident upon several occasions prior to Calvin's death. Twining (Calvin's roommate) testified that there was nothing about the light to indicate that the current flowing through the lamp was high voltage, and that there was no reason to believe that it was any different "than the one you would have in your room."

Each time the bulb was unscrewed and the light extinguished, employees of PG&E were called to the scene to correct the deficiency. The evidence showed that Luth, a PG&E employee, had screwed the bulb back in place on January 26, 1965, and again on February 6, 1965. On March 3, 1965, another employee, Rosner, was dispatched to correct an outage and was informed by Luth that someone had been tampering with the light fixture; PG&E records confirm that Rosner had been directed to "check for tampering." Rosner found the bulb unscrewed, was aware that someone had tampered with it, appreciated the danger involved, and attempted, without success, to locate someone in the apartment to warn. Rosner confirmed that there was nothing on the light to indicate that it contained high voltage; he testified that the bulb is "just a little bit larger" than an ordinary light bulb and can be unscrewed in the same manner as an ordinary bulb.

On March 9, 1965, Calvin's roommate, Twining, stepped onto the fire escape, removed the protective canopy surrounding the bulb by releasing a wire catch, and attempted to remove the bulb with a towel, but was unable to do so because of inadequate friction. Consequently, Calvin put on his ski gloves to insulate his hands from the heat and was electrocuted while attempting to remove the bulb. Apparently, his hand contacted an uninsulated wire lead which provided electricity for the light. Although photographic evidence indicates that there were two thick copper leads terminating below the porcelain bulb socket, Twining testified that he had never observed wires of any kind in or around the light bulb or at its base.

At trial, plaintiff's expert, Oliphant (a consulting electrical engineer registered in California since 1947 and engaged in projects promoting public safety in electrical installations), testified that there was nothing about the light pole to indicate that it contained high voltage, and he suggested that only an expert could make that determination simply by looking at the pole. He further testified that in his opinion the light pole and lamp were not safe, that community standards required that a pole which carries high voltage be placed at least six feet from a building or balcony to prevent possible contact by the public (including trespassing tamperers),

and that a pole any closer to a building should bear a sign warning of high voltage or be equipped with a lockable canopy or other protective device. Since none of these safety features were provided in the instant case, Oliphant considered the lamp unsafe, constituting a dangerous condition.

### 1. *Defendants' Negligence Toward Decedent*

In nonsuiting plaintiffs, the trial court held as a matter of law that neither PG&E, the Chases nor the City could be found negligent toward Calvin Mark. Although we agree that nonsuit was properly entered in favor of the Chases and City, we find sufficient evidence to support a jury verdict against PG&E and conclude that nonsuit should not have been granted in its favor.

a. *Negligence of PG&E*—PG&E asserts that since Calvin was a *trespasser* with respect to the light pole and bulb, PG&E's duty toward him was limited to a duty not to commit affirmative acts of negligence. (See *Radoff* v. *Hunter,* 158 Cal.App.2d 770, 774 [323 P.2d 202]; cf. *Oettinger* v. *Stewart,* 24 Cal.2d 133, 138 [148 P.2d 19, 156 A.L.R. 1221].) As stated in *Radoff,* quoting from another case, " 'Many courts, in imposing this duty of reasonable care towards trespassers and licensees, have drawn a distinction between active and passive negligence, and have limited the reasonable care test to overt acts of negligence. [Citation.] California has quite clearly adopted this distinction and imposed a duty to exercise reasonable care toward known licensees or trespassers so far as active operations are concerned.' " (P. 774.) If *Radoff* represented the prevailing California rule, we would have difficulty specifying any active negligence on PG&E's part in the instant case, for although Calvin could have been found to be a *known* trespasser, his death resulted from a passive condition upon or within PG&E's property.

The active/passive negligence concept, however, no longer represents an inflexible limitation upon the imposition of liability to trespassers or licensees. In *Rowland* v. *Christian,* 69 Cal.2d 108 [70 Cal.Rptr. 97, 443 P.2d 561, 32 A.L.R.3d 496], we traced the evolution of certain special rules for measuring tort liability to trespassers, licensees and invitees. We noted that originally the California rule was that trespassers or licensees were "obliged to take the premises as they find them insofar as any alleged defective condition thereon may exist, and that the possessor of the land owes them only the duty of refraining from wanton or willful injury. [Citations.]" (P. 114.) We next pointed out that an "increasing regard for human safety . . . led to a retreat from this position, and an exception to the general rule limiting liability has been made as to *active operations*

where an obligation to exercise reasonable care for the protection of the licensee has been imposed on the occupier of land. [Citations.] In an apparent attempt to avoid the general rule limiting liability, courts have broadly defined active operations, sometimes giving the term a strained construction in cases involving dangers known to the occupier." (Italics added, p. 114.)

We then explained that the classifications of trespasser, licensee and invitee, the immunities from liability predicated upon those classifications, and the exceptions to those immunities (such as the active negligence rule) had led to complexity and confusion and often "do not reflect the major factors[1] which should determine whether immunity should be conferred upon the possessor of land." (Pp. 116-117.) Accordingly, in *Rowland* we declined to follow and perpetuate the foregoing rigid classifications, immunities and exceptions, adopting in their place the basic test "whether in the management of his property he [the possessor of land] has acted as a reasonable man in view of the probability of injury to others, and, although the plaintiff's status as a trespasser, licensee, or invitee may in the light of the facts giving rise to such status have some bearing on the question of liability, the status is not determinative. . . . Where the occupier of land is aware of a concealed condition involving in the absence of precautions an unreasonable risk of harm to those coming in contact with it . . . the trier of fact can reasonably conclude that a failure to warn or to repair the condition constitutes negligence." (P. 119.)[2]

■ Although the instant case was tried prior to our decision in *Rowland,* it is settled that "On appeal, however, we must apply the law as it stands today. . . . 'It is the general rule that a decision of a court of supreme jurisdiction overruling a former decision is retrospective in its operation and that the effect is not that the former decision was bad law but that

---

[1]Such factors include "the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved." (*Rowland* v. *Christian, supra,* 69 Cal.2d 108, 113.)

[2]See also Civil Code section 1714, providing that "Everyone is responsible, not only for the result of his willful acts, but also for an injury occasioned to another by his want of ordinary care or skill in the management of his property or person, except so far as the latter has, willfully or by want of ordinary care, brought the injury upon himself. . . ." Although *Rowland, supra,* pertained to the liability of one occupying real property, the same rule would apply in measuring the liability of an owner or supplier of personal property. (See *Holliday* v. *Miles, Inc.,* 266 Cal.App.2d 396, 401 [72 Cal.Rptr. 96]; 2 Witkin, Summary of Cal. Law (1960) Torts, § 251, pp. 1446-1447.)

it never was the law.' [Citation.]" (*Beard* v. *Atchison, Topeka & Santa Fe Ry. Co.,* 4 Cal.App.3d 129, 135 [84 Cal.Rptr. 449], applying *Rowland* to reverse a nonsuit granted prior to that decision.) Therefore, we must analyze the evidence in the light of *Rowland's* principles in determining whether any basis exists for finding PG&E negligent toward decedent.

■ As we have seen, plaintiffs' evidence was sufficient to indicate that PG&E knew, or at least should have known, that Calvin or his roommates had been unscrewing the bulb of the lamp post;[3] that the presence of high voltage current constituted a high risk of harm to anyone tampering with the bulb; that reasonable safety precautions (such as straightening the bent post, locking the canopy in place, or warning of high voltage) could have been taken; and that PG&E's failure to take such precautions rendered the lamp post and bulb unsafe.[4] As such a trier of fact could reasonably conclude that PG&E's failure to warn or to repair this dangerous condition constituted negligence.[5] A jury could, of course, conclude otherwise. Yet it seems apparent that plaintiffs were entitled to have the jury consider the question, and consequently the nonsuit in PG&E's favor should not have been granted on the theory that, as a matter of law, PG&E was not negligent.[6]

---

[3]Even prior to *Rowland* v. *Christian, supra,* it was the generally accepted view that a landowner owed a greater duty of care toward *known* trespassers. (See *Radoff* v. *Hunter, supra,* 158 Cal.App.2d 770, 774; *Fernandez* v. *Consolidated Fisheries, Inc.,* 98 Cal.App.2d 91, 96-97 [219 P.2d 73]; 2 Witkin, *supra,* § 250, pp. 1445-1446, § 251, pp. 1446-1447; Rest. 2d Torts, §§ 336-337; Prosser, Torts (4th ed. 1971) § 58, pp. 361-364.) Although some cases had suggested limiting liability to known trespassers to situations involving *active* negligence (see *Radoff, supra*), the pre-*Rowland* trend was toward broader liability (see Prosser, *supra,* p. 363).

[4]See *Austin* v. *Riverside Portland Cement Co.,* 44 Cal.2d 225, 231-232 [282 P.2d 69], regarding the duties owed by one having control of electricity, including the duty to insulate electrical wiring and to make prompt inspections to insure its safety.

[5]In terms of the various factors suggested by *Rowland* as determinative of liability (fn. 1, *ante*), harm to decedent was certainly foreseeable, given PG&E's knowledge of tampering with high voltage wiring, and a clear causal relationship existed between the accident and PG&E's asserted negligence in failing to warn of or repair the hazard. Although PG&E may have been "morally" without blame, imposition of liability would enhance the policy of preventing future accidents. Finally, imposition of liability does not seem unduly burdensome to PG&E considering the probable availability of insurance covering accidents of this nature which are not likely to recur with great frequency.

[6]Plaintiffs also asserted at trial that PG&E had a specific statutory duty of care pursuant to an order of the Public Utilities Commission formulating safety requirements for "overhead electrical line construction." (See General Order 95, rules 11, 20-8, and 37.) Having examined the content of this order, we conclude that the trial court properly excluded it from consideration on the basis that it was inapplicable to street light poles or posts, being concerned only with construction standards for exposed overhead lines supported from crossarms and towers. This conclusion is supported by the fact that General Order 95 has separate provisions governing street lighting.

■ b. *Negligence of the Chases*—Nonsuit in favor of the Chases was entered on the theory that, as a matter of law, the evidence failed to establish that they breached any duty of care toward Calvin, their tenant. We agree. Although they owned the apartment in which Calvin resided, they possessed no control or authority over the street lamp,[7] and had no knowledge of its dangerous propensities. Accordingly, the evidence was insufficient to support a finding that the Chases acted unreasonably in the management of their property. (*Rowland* v. *Christian, supra,* 69 Cal.2d 108, 119; Civ. Code, § 1714.)

■ c. *Negligence of City*—Plaintiffs' theory of recovery against defendant City was that City had some measure of control over the street lamp, and had notice that Calvin and his roommates had complained regarding the intensity of the light. At trial, however, plaintiffs failed to establish the nature of the control possessed or exercised by City, or the extent of its knowledge regarding the dangerous condition of the pole or decedent's tampering therewith. Moreover, neither the lamp post nor the apartment itself were public property of the City. Following presentation of their case, and during arguments with respect to the motions for nonsuit, plaintiffs seemingly invited a nonsuit in favor of City by offering no argument or response to City's motion.

Plaintiffs now suggest that City may have had some affirmative obligation to inspect street lamps for potential hazards. Section 818.6 of the Government Code provides, however, that a public entity is immune from liability for an injury caused by its failure to inspect or its negligent inspection of property other than property owned or controlled by it. (See also Gov. Code, § 830, subd. (c).) As noted above, plaintiffs' evidence was insufficient to establish that City owned or controlled the street lamp. Moreover, even assuming that City had some measure of control over the lamp, there was no evidence indicating that City, by negligent act or omission, created the dangerous condition (Gov. Code, § 835, subd. (a)), or had actual or constructive notice of that condition (Gov. Code, §§ 835, subd. (b), 835.2). We conclude that nonsuit was properly entered in City's favor.

### 2. *Decedent's Contributory Negligence*

The trial court also held, in nonsuiting plaintiffs, that decedent was contributorily negligent[8] as a matter of law. Ordinarily, the issue of con-

---

[7]PG&E has admitted that it owned and maintained the light pole and appurtenances involved herein.

[8]"Contributory negligence is conduct on the part of the plaintiff which falls below the standard to which he should conform for his own protection, and which is a

tributory negligence is one for the jury. (*Pike* v. *Frank G. Hough Co., supra,* 2 Cal.3d 465, 473.) Thus, "The rule is that 'Where the evidence on the issue of contributory negligence is conflicting, and would support a finding either way, the question is one of fact and not of law, and must be decided by the trier of the facts.' [Citation.] '[C]ontributory negligence is not established as a matter of law unless the only reasonable hypothesis is that such negligence exists; that reasonable or sensible men could have drawn that conclusion and none other . . . .' [Citation.]" (*Hogue* v. *Southern Pacific Co.,* 1 Cal.3d 253, 259 [81 Cal. Rptr. 765, 460 P.2d 965].)

Contributory negligence generally falls within one of two categories: (1) voluntary exposure to the danger arising from defendant's negligence, or (2) other conduct falling below the standard of due care, i.e., for an adult, the conduct of a reasonable man under like circumstances. (See 2 Witkin, Summary of Cal. Law, *supra,* Torts, § 325, pp. 1521-1522; Rest.2d Torts, *supra,* § 466.) In order for voluntary exposure to danger to constitute contributory negligence, plaintiff "must have knowledge of such facts that, as a reasonable man, he should realize the danger involved," and "his intentional exposure of himself to the known danger must be unreasonable. In order that it may be unreasonable it is necessary that a reasonable man in his position would not expose himself to it." (Rest.2d Torts, *supra,* § 466, com. at p. 512.)

Thus, our courts have often held that one who knowingly touches a high voltage power line or wire may be held contributorily negligent as a matter of law, since the danger of electrical shock from such high voltage lines is "presumed to be familiar to men of average intelligence." (*Andrews* v. *Valley Ice Co.,* 167 Cal. 11, 20 [138 P. 699] [power lines: decedent was a construction worker who "must have known the danger of getting near highly charged wires"]; see *Shade* v. *Bay Counties Power Co.,* 152 Cal. 10, 12 [92 P. 62] [hanging power lines: decedent was warned not to touch lines and "knew the danger of live wires"]; cf. *Mosley* v. *Arden Farms Co.,* 26 Cal.2d 213, 217 [157 P.2d 372, 158 A.L.R. 872] [all men are charged with knowledge of "the qualities, characteristics, and capacities of things and forces in so far as they are matters of common knowledge at the time and in the community . . ."]; Rest.2d Torts, *supra,* § 290, and illus. 1 [one who grabs high voltage power line is negligent notwith-

legally contributing cause co-operating with the negligence of the defendant in bringing about the plaintiff's harm." (Rest.2d Torts, § 463.) "Unless the actor is a child or an insane person, the standard of conduct to which he must conform for his own protection is that of a reasonable man under like circumstances." (*Id.,* § 464, subd. (1).)

standing ignorance of danger if danger is matter of common knowledge in community].)

■ The evidence in the instant case failed to establish that Calvin himself knew or suspected that the lamp carried high voltage current, or that he appreciated the risk he took in attempting to unscrew the bulb. He had seen his roommates remove the bulb successfully upon several occasions, and there was nothing about the lamp pole or bulb to indicate any possible danger. Although the jury might have concluded that a 24-year-old college student[9] such as Calvin must have known the risk involved, the trial court removed that issue from its consideration.

Therefore, we are left with the question whether, under an objective standard, Calvin, as a reasonable man, should have appreciated the risk of substantial injury or death. Although the authorities indicate that all reasonable men may be deemed to know the risks inherent in touching overhead power lines, we cannot say on the present record that it is a matter of common knowledge either that ordinary street lamps contain high voltage current, or that one risks substantial injury by attempting to unscrew a street lamp bulb of the nature involved herein. As noted above, plaintiffs' expert, Oliphant, testified that there was nothing about the lamp pole which would indicate that it contained high voltage, and that only an expert could make that determination. Moreover, the fact that the bulb was removed on several occasions without causing an electrical shock is, at least, some indication that Calvin's death resulted from an unusual combination of factors with which no lay person may be said to have common knowledge.

It should be kept in mind that upon retrial of this case, defendant PG&E will have the opportunity of establishing, to the jury's satisfaction, that decedent knew or should have known the danger involved in attempting to unscrew the bulb in question. For example, defendant may be able to show, by expert testimony or otherwise, that it is a matter of common knowledge in the community that such a danger exists. Nothing in the present record, however, establishes that proposition, and we are unable to say that the matter is so beyond reasonable dispute as to be subject to judicial notice. (Evid. Code, § 452, subds. (g) and (h).)

We return to the rule, set forth above, that contributory negligence is not established as a matter of law unless reasonable men could have drawn that conclusion *and no other*. (*Hogue* v. *Southern Pacific Co., supra,* 1 Cal.

[9]The record indicates that none of Calvin's courses at college involved the physical sciences, and the expert witness, Oliphant, testified that "It doesn't make any difference what his age is unless he is aware of the voltage that is there."

3d 253, 259.) A natural disinclination to tamper with any electric force would, perhaps, lead many reasonable men to conclude that Calvin acted negligently. Other reasonable men, acknowledging the dilemma which confronted the boys, the various steps they took to resolve their problem before resorting to self-help, and the presence of highly technical factors involved in appraising the dangers of electrical shock, might conclude that Calvin acted as they might have acted under similar circumstances. It is precisely this potential diversity of opinion among reasonable men which leads us to conclude that plaintiffs were entitled to a jury determination of Calvin's contributory negligence.

Defendant PG&E points out, however, that Calvin's conduct violated a public ordinance and urges that such violation constituted contributory negligence per se. Section 585 of the San Francisco Police Code makes it unlawful for "any person . . . without authority, to extinguish any public light," and plaintiffs concede that Calvin violated this ordinance. The California cases have held that under certain circumstances, the violation of a statute or other regulation may constitute negligence per se, or at least raise a rebuttable presumption of negligence. (See *Satterlee* v. *Orange Glenn School Dist.,* 29 Cal.2d 581, 587-590 [177 P.2d 279]; 2 Witkin, Summary of Cal. Law, *supra,* Torts, §§ 230-235, pp. 1423-1432, and cases cited.) ██ Similarly such a violation by the plaintiff may constitute *contributory* negligence per se. (*Farole* v. *Eichman,* 39 Cal.2d 822, 824 [249 P.2d 261]; 2 Witkin, *supra,* §§ 334-337, pp. 1534-1539, and cases cited.) The rule of the foregoing cases is now codified in section 669 of the Evidence Code (added 1967), which provides: "(a) The failure of a person to exercise due care is presumed if:

"(1) He violated a statute, ordinance, or regulation of a public entity;

"(2) The violation proximately caused death or injury to person or property;

"(3) The death or injury resulted from an occurrence of the nature which the statute, ordinance, or regulation was designed to prevent; and

"(4) The person suffering the death or the injury to his person or property was one of the class of persons for whose protection the statute, ordinance, or regulation was adopted.

"(b) This presumption may be rebutted by proof that:

"(1) The person violating the statute, ordinance, or regulation did what might reasonably be expected of a person of ordinary prudence, acting under similar circumstances, who desired to comply with the law . . . ."

 It seems apparent to us that the presumption of negligence set forth in section 669 did not form a proper basis for a nonsuit against decedent. First, defendant PG&E has not shown that section 585 was intended to prevent injury or death from electrocution. The complete text of section 585 (adopted in 1903) is as follows: "It shall be unlawful for any person to hitch or fasten any animal to, or to place any placard or notice upon, or in anywise to injure any lamppost or hydrant, or any growing tree, upon any public street, or, without authority, to extinguish any public light." The evident purposes of section 585 are to protect public property and assure adequate lighting of public streets. Thus, the requirement of section 669, subdivision (a), subsection (3), that the death or injury resulted from an occurrence of the nature which the ordinance was designed to prevent, is not satisfied. Further, as section 585 evidently sought to protect the street-using public, by assuring adequate street lighting, it cannot be said that Calvin Mark was, under section 669, subdivision (a), subsection (4), one of the class of persons for whose protection the ordinance was adopted. Accordingly, two essential elements of section 669 remain unfulfilled,[10] and we need not reach the further question whether the jury should have been given the opportunity to determine, under section 669, subdivision (b), subsection (1), whether Calvin acted as a reasonable person would have acted under similar circumstances who desired to comply with the law. (See *Alarid* v. *Vanier*, 50 Cal.2d 617, 624 [327 P.2d 897], and *Beard* v. *Atchison, Topeka & Santa Fe Ry. Co., supra,* 4 Cal.App.3d 129, 140, regarding the rebuttable nature of the presumption of negligence.)

Defendant PG&E asserts that even if the question of contributory negligence was a matter for the jury to decide, nevertheless nonsuit was proper because Calvin "willfully" violated the above-quoted police ordinance. Defendant has cited no cases which would support this theory, and our research has disclosed none. Were we to accept the premise that one who "willfully" engages in unlawful conduct thereby forfeits any claim to recover in tort for another's negligence, we would totally undermine the rationale underlying *Rowland* v. *Christian, supra,* 69 Cal.2d 108, 119, that plaintiff's status as trespasser should be only one of several factors to be weighed by the trier of fact in determining liability.

---

[10]Even before the adoption of section 669, the cases had held that in order for a violation of statute or ordinance to constitute negligence, it must be shown that the provisions thereof were designed to protect persons in plaintiff's class from the type of injury which in fact occurred. (See *Solgaard* v. *Guy F. Atkinson Co.,* 6 Cal.3d 361, 366-367 [99 Cal.Rptr. 29, 491 P.2d 821]; *Haft* v. *Lone Palm Hotel,* 3 Cal.3d 756, 769, fn. 13 [91 Cal.Rptr. 745, 478 P.2d 465]; 2 Witkin, *supra,* § 234, pp. 1429-1430; Rest.2d Torts, *supra,* §§ 286, 288.)

We conclude that decedent was not contributorily negligent as a matter of law and that nonsuit should not have been granted in favor of defendant PG&E. The judgments in favor of defendants Chase and City are affirmed; the judgment in PG&E's favor is reversed.

Peters, J., Mosk, J., and Schauer, J.,* concurred.

**WRIGHT, C. J.,** Concurring and Dissenting.—I concur with the majority that nonsuits were properly entered against plaintiffs in favor of the defendant landlords and the defendant City and County of San Francisco. I would further hold that the nonsuit was also properly entered in favor of Pacific Gas and Electric Company (P. G. & E.) and, accordingly, I dissent from the majority holding that the judgment in favor of that defendant is to be reversed.

The record fairly establishes, as the majority conclude, that there is sufficient evidence to support a finding of negligent conduct on the part of P. G. & E., its employees or agents, at least for purposes of avoiding a nonsuit on that limited ground. (See *Grudt* v. *City of Los Angeles* (1970) 2 Cal.3d 575, 586-587 [86 Cal.Rptr. 465, 468 P.2d 825].) Plaintiffs must additionally establish, however, the impropriety of the trial court's finding that the decedent was, as a matter of law, contributorily negligent.

Contributory negligence exists as a matter of law where reasonable men could have drawn no other sensible conclusion than that the conduct of the injured party fell below the standard to which he should conform for his own protection. (*Hogue* v. *Southern Pacific Co.* (1969) 1 Cal.3d 253, 259 [81 Cal.Rptr. 765, 460 P.2d 965].) An intentional and unreasonable exposure to danger created by defendant's negligence, of which danger the decedent had knowledge or had reason to know, constitutes contributory negligence. (Rest.2d Torts, § 466(a).) The majority concede on sound authority that the danger of electrical shock is presumed within the knowledge of all reasonable men.[1] The decedent, who was 24 years of age, undisputedly was thus required to conduct himself as would a reasonable man with knowledge of the dangerous propensities of electrical current.

Contrary to inferences which may be drawn from the majority opinion, the mechanics of extinguishing the light in the instant case were fraught

---

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.

[1]Part of this common knowledge is the fact that even household current can produce a fatal shock. In my opinion, the majority erroneously attempts to distinguish knowledge of "high voltage" current from the current involved in the case at bar.

with hazards not apparent in changing a household light bulb. The large two-and-one-half-foot plastic canopy enclosing the bulb was secured to the steel pole by three metal clips which first had to be loosened or disengaged before the canopy itself could be removed. Thereafter it was necessary to extinguish the light by unscrewing the hot bulb from its porcelain socket. This could be accomplished by standing on a metal fire escape and leaning against or reaching across a metal railing. This action the decedent took while barefooted. With the canopy removed not only the bulb but also the heavy bare electrical terminals were exposed to sight and touch. Through these terminals flowed current which powered such an intense light that one could read even with the drapes drawn and the room lights extinguished. To remove the bulb the decedent, wearing ski gloves, of necessity faced a bright light and reached his hands into an area which was within a few inches of the exposed terminals.[2] The issue, then, is the simple one whether a person with knowledge of the danger of electrical shock and who has conducted himself in the manner indicated has exercised that degree of care which he is required to use for his own protection. Even though decedent may have thought there was no other method available by which he could seek refuge from the disturbing effects of the bright light, the reasonable man would not engage in the type of conduct undertaken by decedent and encounter the risk of electrocution. (Cf. Rest.2d Torts, § 473, com. d.) Wilful disregard of a risk known to him or so obvious that he must be taken to have been aware of it, and so great as to make it highly probable that harm would follow (cf. Prosser, Law of Torts (4th ed.) p. 185) resulted in decedent's unfortunate death. I cannot realistically come to any other conclusion but that, as a matter of law, the decedent completely failed to conform to the standard required of him, and that his failure was a proximate cause of his death.

The judgment of nonsuit is thus compelled and I would affirm the judgment in its entirety.

McComb, J., and Sullivan, J., concurred.

---

[2]Included in the record are photographic exhibits clearly protraying the juxtaposition of the window, fire escape, lamp post, canopy, bulb when exposed, and the exposed terminals and circuitry within the canopy at the base of the bulb.