827 F.2d 1233
 Ronald Roy HENDERSON, Plaintiff-Appellant,
v.
UNITED STATES of America, Defendant-Appellee.
 No. 83-5749.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted July 9, 1985.
Decided March 11, 1986.
Amended Opinion May 27, 1986.
Second Amended Opinion May 6, 1987.
Third Amended Opinion Sept. 4, 1987.
 
 Michael M. Angello, San Diego, Cal., for plaintiff-appellant.
 Warren P. Reese, San Diego, Cal., for defendant-appellee.
 Appeal from the United States District Court for the Southern District of California.
 Before NELSON, CANBY and BRUNETTI, Circuit Judges.
 THIRD AMENDED OPINION
 NELSON, Circuit Judge:
 
 
 1
 Ronald Roy Henderson suffered severe injury as a result of contact with high voltage wires while trespassing on federal land. The district court entered judgment for the United States, dismissing Henderson's claim under the Federal Tort Claims Act (FTCA), 28 U.S.C. Sec. 1346(b) (1982). We reverse and remand.
 
 I. FACTUAL BACKGROUND
 
 2
 On July 17, 1977, Jeffrey Harmon, then age 26, and Henderson, age 20, entered a remote section of Miramar Naval Air Station, formerly used as a missile test facility, to remove copper cable attached to a power pole. Henderson and Harmon entered the facility by car through a breach in the fence. Although "Government Property No Trespassing" signs marked the area, access was not difficult, and trespassing was commonplace. Vandalism, salvaging, firearm shooting, motorcycle riding, and beer drinking occurred with regularity at the missile test site area. Henderson and Harmon themselves had previously entered the facility.
 
 
 3
 Harmon and Henderson drove to a power pole near a water tank approximately 1000 feet from the missile test site area. After assuring Henderson that the power lines were dead, Harmon climbed the thirty-three foot power pole with the assistance of climbing gaffs (spiked shoes) and a safety belt. As Harmon attempted to cut the copper cable, he touched an exposed live wire. Henderson saw a flash and saw Harmon's body lurch backwards.
 
 
 4
 Henderson climbed the power pole in an attempt to return Harmon to the ground. Henderson grabbed a live wire, received a shock, and was thrown from the pole. Injuries from the fall left Henderson permanently paralyzed.
 
 II. FORESEEABILITY
 
 5
 The United States, as the owner and operator of the naval base and missile test facility, is liable for claims brought under the FTCA to the extent a private party would be liable under similar circumstances.[1] 28 U.S.C. Sec. 1346(b) (1982). Here, the alleged wrongdoing took place in California. We look to California law to determine the rights, duties, and liabilities involved in the maintenance of high voltage power lines. See Molsbergen v. United States, 757 F.2d 1016, 1020 (9th Cir.) (law of the state where the act or omission occurred determines whether actionable duty exists under the FTCA),cert. dismissed, 473 U.S. 934, 106 S.Ct. 30, 87 L.Ed.2d 706 (1985).
 
 
 6
 Under California law, as a general rule, a "defendant owes a duty of care to all persons who are foreseeably endangered by his conduct, with respect to all risks which make the conduct unreasonably dangerous." Tarasoff v. Board of Regents, 17 Cal.3d 425, 434, 551 P.2d 334, 342, 131 Cal.Rptr. 14, 22 (1976); Rodriguez v. Bethlehem Steel Corp., 12 Cal.3d 382, 399, 525 P.2d 669, 680, 115 Cal.Rptr. 765, 776 (1974). The district court found that the accident resulting in Henderson's injury was not foreseeable. We review the district court's factual determinations under the clearly erroneous standard. See United States v. McConney, 728 F.2d 1195, 1200 (9th Cir.) (en banc), cert. denied, 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984). We review the legal determinations de novo. Id. at 1201.
 
 
 7
 The district court's conclusion that the accident was not foreseeable was based on three factors. First, the court found that while members of the public entered the facility to "sightsee, picnic, drink beer, have parties, spray paint graffiti, commit vandalism and take copper wiring and other material," those activities took place at the missile test site, not at the nearby water tank area.[2] Second, the court found no evidence of tampering with the power poles before the accident that should have placed government employees on notice of possible danger. Third, the court determined that the government could not be expected to foresee the actions of Harmon or Henderson or of "people in the same status," apparently referring to their presence on government land as trespassers and thieves.
 
 
 8
 California law imposes a duty on a property owner, as we view the government in this FTCA case, to act as "a reasonable man in view of the probability of injuries to others," without giving determinative weight to the status of the injured party. Rowland v. Christian, 69 Cal.2d 108, 119, 443 P.2d 561, 568, 70 Cal.Rptr. 97, 104 (1968) (en banc). "Where the occupier of land is aware of a concealed condition involving in the absence of precautions an unreasonable risk of harm to those coming in contact with it ... the trier of fact can reasonably conclude that a failure to warn [of] or to repair the condition constitutes negligence." Mark v. Pacific Gas & Electric, 7 Cal.3d 170, 177, 496 P.2d 1276, 1280, 101 Cal.Rptr. 908, 912 (1972) (quoting Rowland, 69 Cal.2d at 119, 70 Cal.Rptr. at 104, 443 P.2d at 568).
 
 
 9
 Here, the clear weight of the evidence shows that the danger posed by the high voltage wires at an unused facility, when combined with indications of potential public contact with the hazard, gave rise to foreseeable harm. It is undisputed that trespassing, theft of property, and other activities were uncontrolled and extensive within the missile test facility as a whole. The public had virtually uninhibited access to the area through often-breached fences ornamented with bullet-riddled "no trespassing" signs.
 
 
 10
 We believe that the district court's distinction between two areas of the missile test facility, the missile test site and the water tank area, is artificial and unsupported by the evidence. No physical barrier, such as a fence, separates the test site from the water tank area. The water tank area is part of the facility and the subject of at least some public curiosity. In fact, Harmon and his family drove through the facility, including the water tank area, one month before the accident. Given the rampant trespassing at the missile test site, a reasonable landowner would have been placed on notice that the water tank area, 1000 feet away and accessible by road, was also subject to unauthorized visitation.[3] The district court's finding to the contrary is clearly erroneous.
 
 
 11
 Next, the district court's conclusion that no instance of tampering with power poles had occurred to put government employees on notice, contradicts its conclusion that Harmon himself had stolen conductor wires from another power pole fifteen days before the accident. Thus, the absence of stolen conductor wires and the presence of cut tail ends must have gone unnoticed during at least fifteen area security inspections for the government to have been unaware of tampering. Government employees, who inspected the area between one and four times daily, reasonably should have been aware of Harmon's tampering.
 
 
 12
 Third, we interpret the district court's reference to Harmon's and Henderson's "status" to comply with California law--that is, as having some bearing on the question of liability, but not as a determinative factor. See Rowland, 69 Cal.2d at 119, 443 P.2d at 568, 70 Cal.Rptr. at 104. However, because almost all the foreseeable victims were trespassers and at least some of them were thieves, Harmon's and Henderson's status has no bearing on the issue of foreseeability in this case.
 
 
 13
 Additional factors also persuade us of the foreseeability of the potential harm. First, the presence of high voltage wires constituted a high risk of harm, reasonably requiring heightened caution. See Mark, Cal.3d at 178, 496 P.2d at 1281, 101 Cal.Rptr. at 913. Second, a Navy electrician testified as to the navy's policy of deenergizing out-of-use power lines for reasons of safety. The final remaining use for the power lines at the facility--a communications radio--had been removed almost a month before the accident. The Navy's policy indicates an awareness of potential hazards. Third, before the accident, another Navy electrician recommended deenergizing the power lines, again evidencing the government's awareness of the danger.
 
 
 14
 In sum, we believe that the potential danger of the 12,000 volt power lines at an unused facility, combined with evidence of easy access, extensive vandalism, and damage to other power lines at least fifteen days before the accident creates a foreseeable risk of injury.
 
 III. DUTY
 
 15
 The foreseeability of risk ordinarily gives rise to a duty to reduce or warn of that risk. See Molsbergen, 757 F.2d at 1021; Tarasoff, 17 Cal.3d at 434, 551 P.2d at 342, 131 Cal.Rptr. at 22. The district court did not find the accident foreseeable and therefore did not determine the extent of the government's duty under California common law. It also concluded that the government was not presumed negligent under Cal.Evid.Code Sec. 669(a),[4] because it determined that California Public Utility Commission General Order No. 95 (GO 95), setting forth safety standards for the design and construction of high voltage power lines, did not apply to the United States in this case. Because the applicability of GO 95 to the United States raises a legal issue, we address that issue first.
 
 
 16
 A. Presumed Negligence.
 
 
 17
 Under the statutory provision for presumed negligence, any applicable statute, ordinance, or regulation defines the extent of the defendant's duty. See Cal.Evid.Code Sec. 669 (West Supp.1987). By its own terms, GO 95 applies only to overhead electrical supply and communication lines that "come within the jurisdiction of" the California Public Utilities Commission (the Commission). GO 95, Rule 12. The district court held GO 95 inapplicable because the United States did not function as a public utility in maintaining power lines at the missile facility. We agree.
 
 
 18
 The principal regulatory power of the Commission extends only to "public utilities." See Cal.Pub.Util.Code Secs. 201-2115 (West 1975 & Supp. 1987). The predecessors of these provisions, originally enacted in 1911, created the California Railroad Commission (now the Commission) and gave it power to regulate utilities. 1911 (extra session) Cal.Stat. 18, ch. 14. Sections 216-218 currently define "public utility" as including, inter alia, (1) an electrical corporation that owns, controls, or operates fixtures for the transmission of power, for compensation, to the public or any portion thereof, see Cal.Pub.Util.Code Secs. 216(a), (b), 217, 218(a) (West 1975 & Supp.1987), and (2) a person or corporation that performs any service for, or delivers any commodity to, an entity that in turn performs that service for, or delivers any commodity to, the public or some portion thereof, see id. Sec. 216(c) (West Supp.1987). The government in this case clearly does not fall in either category.
 
 
 19
 Henderson argues, however, that GO 95 was enacted pursuant to Sec. 8037, whose different statutory history purportedly demonstrates that the regulation is of broader application. In 1911, the California legislature, pursuant to its general police powers, enacted what is now Cal.Pub.Util.Code Secs. 8001-8036 (West 1965 & Supp.1987), which regulate the placing, erection, use, and maintenance of electrical poles, wires, and cables. 1911 Cal.Stat. c. 499, Sec. 1. By their terms, these provisions apply to everyone, see Cal.Pub.Util.Code Sec. 8002 (West 1965), and from 1911 to 1915 they were subject to enforcement only through the normal criminal processes. In 1915, the California legislature enacted what is now Cal.Pub.Util.Code Sec. 8037 (West 1965). This section gave the Commission the duty to enforce Secs. 8001-8036 and authorized the Commission to "make such further additions or changes as the commission deems necessary for the purpose of safety to employees and the general public." Pursuant to Sec. 8037, the Commission enacted General Order 26, which later became General Order 64, 64-A, and finally, GO 95. See In re Reasonableness of Rules for Overhead Elec. Line Constr., 43 Cal. RR Comm'n 872, 873 n. 1 (1941).
 
 
 20
 Henderson contends that GO 95 is applicable to the United States because Sec. 8037 is part of legislation that was not limited to public utilities, as are the provisions in Secs. 201-2115. This argument overlooks the fact that the constitutional provisions in force at the time Sec. 8037 was enacted did not confer on the California legislature the power to regulate nonutilities.
 
 
 21
 In 1913, the constitutional provisions allowing the California legislature to grant additional powers to the Commission were as follows:
 
 
 22
 The Railroad Commission shall have and exercise such power and jurisdiction to supervise and regulate public utilities, in the state of California, and to fix the rates to be charged for commodities furnished, or services rendered by public utilities as shall be conferred upon it by the Legislature, and the right of the Legislature to confer powers upon the Railroad Commission respecting public utilities is hereby declared to be plenary and to be unlimited by any provision of this Constitution.... Nothing in this section shall be construed as a limitation upon any power conferred upon the Railroad Commission by any provision of this constitution now existing or adopted concurrently herewith.
 
 
 23
 Cal. Const. Art. XII, Sec. 23 (amended 1911, 1914, repealed 1974) (emphasis added).
 
 
 24
 No provision of this Constitution shall be construed as a limitation upon the authority of the Legislature to confer upon the Railroad Commission additional powers of the same kind or different from those conferred herein which are not inconsistent with the powers conferred upon the Railroad Commission in this Constitution, and the authority of the Legislature to confer such additional powers is expressly declared to be plenary and unlimited by any provision of this Constitution.
 
 
 25
 Cal. Const. Art. XII, Sec. 22 (amended 1911, 1946, repealed 1974).
 
 
 26
 Case law construing these constitutional provisions indicates that the legislature could grant additional powers to the Commission, but such legislation must appear on its face to be cognate and germane to the regulation of public utilities. Frost v. Railroad Comm'n, 197 Cal. 230, 241, 240 P. 26, 30-31 (1925) (stating that "this grant of authority to confer additional powers [under Article XII, Sec. 22] is limited (so far as applicable to the question here under consideration) to such additional powers as are cognate and germane to the regulation of railroads and other transportation companies"), rev'd on other grounds, 271 U.S. 583, 46 S.Ct. 605, 70 L.Ed. 1101 (1926); Ivanhoe Irrigation Dist. v. All Parties & Persons, 47 Cal.2d 597, 644, 306 P.2d 824, 852 (1957) ("Assuming the plenary power of the Legislature to enact laws respecting the regulation and control of public utilities notwithstanding any provision of the Constitution to the contrary, Art. 12, Sec. 22, Constitution, nevertheless such legislation must appear on its face to be cognate and germane to the regulation of public utilities to come within the Legislature's plenary power."), rev'd on other grounds, 357 U.S. 275, 78 S.Ct. 1174, 2 L.Ed.2d 1313 (1958); Morris v. Sierra & San Francisco Power Co., 57 Cal.App. 281, 289-90, 207 P. 262, 266 (1922). Henderson has not cited any California authority that squarely holds that the Commission has power to regulate non-utilities. Cf. In re Los Angeles Metro. Transit Auth., 60 Cal. PUC 125, 133 (1962) (stating, in the context of publicly owned and privately owned utilities, that GO 95 applies "to private persons, including corporations"). Thus, the applicable constitutional provisions did not give the legislature authority to confer upon the Commission a general police power to regulate the placing, erection, use, and maintenance of electrical poles, wires, and cables, regardless of whether or not the party was a utility.
 
 
 27
 In 1974, California adopted Article XII, Secs. 3 and 5, of the California Constitution, which empowers the legislature to confer any necessary authority upon the Commission to define broadly the persons affected by its regulations. Since that time, however, the California Legislature has not conferred additional authority on the Commission. We therefore conclude that GO 95 is not applicable to non-utilities such as the United States in this case. Accordingly, Henderson's claim of presumed negligence cannot be founded on an alleged violation of GO 95.[5]
 
 
 28
 B. Common law negligence.
 
 
 29
 As the district court recognized, it should also consider whether the United States had a common law duty of reasonable care. See Silveira v. Imperial Irrigation Dist., 85 Cal.App.3d 705, 708, 149 Cal.Rptr. 653, 655 (1978). While we do not resolve the issue, we note that, in addition to foreseeability of harm to the plaintiff, California courts look to several other factors to determine the existence of a duty:
 
 
 30
 the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved.
 
 
 31
 Preston v. Goldman, 42 Cal.3d 108, 720 P.2d 476, 481-82, 227 Cal.Rptr. 817, 822-23 (1986) (quoting Rowland, 69 Cal.2d at 112-13, 443 P.2d at 564, 70 Cal.Rptr. at 100); see Becker v. IRM Corp., 38 Cal.3d 454, 467, 698 P.2d 116, 124, 213 Cal.Rptr. 213, 221 (1985); Isaacs v. Huntington Mem. Hosp., 38 Cal.3d 112, 125-26, 695 P.2d 653, 658, 211 Cal.Rptr. 356, 361 (1985); see also Rowland, 69 Cal.2d at 119, 443 P.2d at 568, 70 Cal.Rptr. at 104 (plaintiff's status may have "some bearing on the question of liability, [but] is not determinative").
 
 
 32
 Although California courts have stated that the foreseeability of the injury to the plaintiff is the most important factor, see Sun 'N Sand, Inc. v. United Cal. Bank, 21 Cal.3d 671, 695, 582 P.2d 920, 937, 148 Cal.Rptr. 329, 346 (1978); Vandermost v. Alpha Beta Co., 164 Cal.App.3d 771, 777, 210 Cal.Rptr. 613, 616 (1985); Forrand v. Foodmaker, Inc., 182 Cal.App.3d 196, 199, 227 Cal.Rptr. 74, 75 (1986); Rodriguez v. Inglewood Unified School Dist., 186 Cal.App.3d 707, 711, 230 Cal.Rptr. 823, 825 (1986), "[i]t is clear that [it] is but one factor to be weighed," and its importance will "vary from case to case." Isaacs, 38 Cal.3d at 126, 695 P.2d at 658, 211 Cal.Rptr. at 361. Indeed, "[t]his balancing [of Rowland factors] must be conducted anew in each case, based on the factors present in that case." Gomez v. Ticor, 145 Cal.App.3d 622, 629, 193 Cal.Rptr. 600, 604 (1983). Accordingly, California courts have found a duty in numerous fact settings, and no duty in others.[6]
 
 
 33
 The district court erred when it found no duty based solely on the factor of foreseeability. In light of this error, we vacate the district court's decision and remand to reconsider its decision in light of all the factors cited in Rowland. On remand, along with analyzing whether the defendant owed a duty of care to the plaintiff, if the district court concludes that such a duty existed, it should also determine (a) the scope of that duty, (b) whether the United States breached such a duty, (c) whether the breach proximately caused Henderson's injuries, and (d) the applicability of any defenses and counter-defenses, such as assumption of risk and the rescue doctrine. The court should make any factual findings necessary to the resolution of these questions.
 
 CONCLUSION
 
 34
 For the reasons given above, the decision of the district court is REVERSED AND REMANDED.
 
 BRUNETTI, Circuit Judge, Concurring:
 
 35
 I join and concur in part III A, Presumed Negligence, of the opinion, but must concur separately as to part II, Foreseeability, and part III, Duty, because although the opinion arrives at the correct result, I believe the duty and foreseeability discussions create confusion in this convoluted and complex area of California law.
 
 
 36
 * DUTY
 
 
 37
 In California "[j]udicial treatment of the concept of 'duty' within the negligence context has left a legacy of analytical confusion." Lopez v. McDonald's, 193 Cal.App.3d 495, 238 Cal.Rptr. 436 (1987).[1] Unfortunately it appears that the district court got caught in this quagmire and incorrectly applied California law as it relates to duty.
 
 
 38
 We begin with the "general rule ... that all persons have a duty 'to use ordinary care to prevent others being injured as a result of their conduct....' " Ballard v. Uribe, 41 Cal.3d 564, 715 P.2d 624, 629, 224 Cal.Rptr. 664, 669 (1986) (quoting Rowland v. Christian, 69 Cal.2d 108, 112, 443 P.2d 561, 70 Cal.Rptr. 97). This policy is expressed in Cal.Civ.Code Sec. 1714(a) which states: "Everyone is responsible, not only for the result of his willful acts, but also for an injury occasioned to another by his want of ordinary care or skill in the management of his property or person." See also Preston v. Goldman, 42 Cal.3d 108 (1986), 720 P.2d 476, 481, 227 Cal.Rptr. 817, 822. Thus, as a general proposition of law, California landowners owe a duty of ordinary care to those who are come upon their premises.
 
 
 39
 However, because the decision that a landowner generally owes a "duty" to those injured on his land is a policy determination, Rowland v. Christian, 69 Cal.2d 108, 112, 443 P.2d 561, 70 Cal.Rptr. 97 (1975), recognized that there are exceptions to that rule[2] and a decision not to apply the general rule involves the balancing of a number of policy considerations. The opinion correctly cites these factors as:
 
 
 40
 "the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved."
 
 
 41
 Preston v. Goldman, 42 Cal.3d 108 (1986), 720 P.2d 476, 481, 227 Cal.Rptr. 817, 822-23 (quoting Rowland v. Christian, 69 Cal.2d 108, 112-113, 443 P.2d 561, 565, 70 Cal.Rptr. 97, 100).[3]
 
 
 42
 As the opinion notes, in applying Rowland, some California courts have placed particular emphasis on whether the injury to the plaintiff was foreseeable. However, foreseeability "is but one factor to be weighed...." Moreover, in "this balancing process, foreseeability is an elastic factor. The degree of foreseeability necessary to warrant the finding of a duty will thus vary from case to case." Isaacs v. Huntington Memorial Hospital, 38 Cal.3d 112, 126, 695 P.2d 653, 211 Cal.Rptr. 356, 361 (1985). Thus, merely because harm may be foreseeable does "not automatically impose a duty[,]" Clarke v. Hoek, 174 Cal.App.3d 208, 214-15, 219 Cal.Rptr. 845, 849 (1985), and "other policy factors may move the court to decide, as a matter of law, not to accord protection to the particular plaintiff."[4] Indeed, "[t]his balancing [of Rowland factors] must be conducted anew in each case, based on the factors present in that case." Gomez v. Ticor, 145 Cal.App.3d 622, 629, 193 Cal.Rptr. 600, 604 (1983). As the opinion states, in different factual settings California courts have either found the existence of a duty or rejected the existence of a duty based on the Rowland factors.
 
 
 43
 In this case the district court failed to properly apply California law because it's analysis of whether a "duty" existed rested solely on whether the plaintiff's actions were foreseeable. The court should have also considered the other six factors set out in Rowland to determine whether the California Supreme Court would impose a duty on the defendant in this kind of situation. In addition, a seventh factor, the status of the plaintiff as a trespasser, may be considered in determining whether such a duty exists.[5]
 
 
 44
 My disagreement with the majority opinion is that even though it recognizes and agrees with this analysis, it contradicts itself by overemphasizing the importance of foreseeability with its statement that the "foreseeability of the risk ordinarily gives rise to a duty to reduce or warn of that risk." While the foreseeability of a risk may indeed be a compelling factor in any given case, the opinion agrees that its importance, as well as the importance of the other seven factors, varies with the facts and circumstances of each case. Thus, the blanket statement that foreseeability ordinarily gives rise to a duty, is simply contrary to California law and unfortunately appears to reaffirm the common misconception that foreseeability equals duty.
 
 II
 FORESEEABILITY
 
 45
 I agree with the majority that the district court erred in its finding that the accident was entirely unforeseeable. There was testimony introduced that prior to the accident there were wires dangling from pole 27--located just four poles down from the accident site.[6] It appears that the government does not dispute that Harmon cut those wires on June 2, but argues that pole 27 could not be easily seen from the road.[7] The fact that wires had been visibly removed from the accident area is buttressed by the district court's finding that fifteen days before the accident Harmon had stolen overhead wires from the same area (the span between poles 20 and 27). Thus, the district court's finding of fact number 35 that "[t]here was no evidence of tampering with pole lines which reasonably should have put cognizant employees of the United States on notice that members of the public might enter the facility and climb poles to remove or tamper with conductors[ ]" is clearly erroneous. There was some degree of foreseeability.
 
 
 46
 Foreseeability is an elastic factor. The district court must determine how important foreseeability is in this particular case, and then balance that factor along with the other Rowland factors to determine whether a duty existed under California law.
 
 
 
 [1]
 We reject the government's argument that the "discretionary function exemption" to FTCA liability, 28 U.S.C. Sec. 2680(a), precludes liability. The exception applies only to decisions "grounded in social, economic and political policy." Begay v. United States, 768 F.2d 1059, 1064 (9th Cir.1985); see Mitchell v. United States, 787 F.2d 466, 468 (9th Cir.1986). While the actions of agencies in deciding how to regulate private conduct are easily brought within the exception, see United States v. Empresa de Viacao Aerea Rio Grandense (Varig Airlines), 467 U.S. 797, 813-14, 104 S.Ct. 2755, 2764-65, 81 L.Ed.2d 660 (1984); Begay, 768 F.2d at 1064, no such regulatory activity is involved here
 
 
 [2]
 The water tank stands about 1000 feet from the test site as the crow flies and about 1/2 to 3/4 mile by way of the road which winds its way between the two areas
 
 
 [3]
 The lack of extensive litter at the water tank area, though such litter was prevalent at the test site, does not undermine the conclusion. The flatter test site was the more obvious picnic and drinking spot
 
 
 [4]
 Cal.Evid.Code Sec. 669(a) provides:
 The failure of a person to exercise due care is presumed if:
 (1) He violated a statute, ordinance, or regulation of a public entity;
 (2) The violation proximately caused death or injury to person or property;
 (3) The death or injury resulted from an occurrence of the nature which the statute, ordinance, or regulation was designed to prevent; and
 (4) The person suffering the death or the injury to his person or property was one of the class of persons for whose protection the statute, ordinance, or regulation was adopted.
 
 
 [5]
 We also hold that Cal.Pub.Util.Code Sec. 8029 (West 1965) does not directly apply to non-utilities such as the United States in this case, as Henderson also contends. As discussed above, although this section is broadly applicable to "persons," in 1915 Sec. 8037 vested responsibility for its enforcement in the Commission, whose jurisdiction was limited to public utilities at that time
 
 
 [6]
 For a sampling of cases finding a duty under Rowland, see Becker v. IRM Corp., 38 Cal.3d 454, 698 P.2d 116, Cal.Rptr. 213 (1985); Isaacs v. Huntington Mem. Hosp., 38 Cal.3d 112, 695 P.2d 653, 211 Cal.Rptr. 356 (1985); Peterson v. San Francisco Comm. College Dist., 36 Cal.3d 799, 685 P.2d 1193, 205 Cal.Rptr. 842 (1984); Mark v. Pacific Gas & Elec. Co., 7 Cal.3d 170, 178 n. 5, 496 P.2d 1276, 1281 n. 5, 101 Cal.Rptr. 908, 913 n. 5 (1972); Noble v. Los Angeles Dodgers, Inc., 168 Cal.App.3d 912, 214 Cal.Rptr. 395 (1985); Cohen v. Southland Corp., 157 Cal.App.3d 130, 203 Cal.Rptr. 572 (1984); Gomez v. Ticor, 145 Cal.App.3d 622, 193 Cal.Rptr. 600 (1983); Soldano v. O'Daniels, 141 Cal.App.3d 443, 190 Cal.Rptr. 310 (1983); Uccello v. Laudenslayer, 44 Cal.App.3d 504, 118 Cal.Rptr. 741 (1975)
 For examples of cases finding no duty, see Preston v. Goldman, 42 Cal.3d 108, 720 P.2d 476, 227 Cal.Rptr. 817 (1986); Lopez v. McDonald's, 193 Cal.App.3d 495, 238 Cal.Rptr. 436 (1987); Forrand v. Foodmaker, Inc., 182 Cal.App.3d 196, 227 Cal.Rptr. 74 (1986); Gregorian v. National Convenience Stores, 174 Cal.App.3d 944, 220 Cal.Rptr. 302 (1985); Bisetti v. United Refrigeration Corp., 174 Cal.App.3d 643, 220 Cal.Rptr. 209 (1985); Clarke v. Hoek, 174 Cal.App.3d 208, 219 Cal.Rptr. 845 (1985); Allen v. Toten, 172 Cal.App.3d 1079, 218 Cal.Rptr. 725 (1985); Lundy v. California Realty, 170 Cal.App.3d 813, 216 Cal.Rptr. 575 (1985); Vandermost v. Alpha Beta Co., 164 Cal.App.3d 771, 210 Cal.Rptr. 613 (1985); Harris v. Smith, 157 Cal.App.3d 100, 203 Cal.Rptr. 541 (1984).
 
 
 [1]
 See also Marois v. Royal Investigation & Patrol, Inc., 162 Cal.App.3d 193, 197-99, 208 Cal.Rptr. 384 (1984); Hucko v. City of San Diego, 179 Cal.App.3d 520, 523, 224 Cal.Rptr. 552 (1986)
 
 
 [2]
 "[D]uty is not sacrosanct in itself," Dillon v. Legg, 68 Cal.2d 728, 734, 441 P.2d 912, 69 Cal.Rptr. 72 (1968), nor is " 'duty' ... an immutable fact of nature," Ballard, 41 Cal.3d 564, 715 P.2d 624, 628, 224 Cal.Rptr. 664 at 669, n. 6, rather, it is " 'only an expression of the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection.' " Dillon v. Legg, 68 Cal.2d 728, 734, 441 P.2d 912, 69 Cal.Rptr. 72, (quoting Prosser, Law of Torts, 332-33 (3rd ed. 1964)); Lopez v. McDonald's, 193 Cal.App.3d 495, 238 Cal.Rptr. 436 (1987); Molsbergen v. United States, 757 F.2d 1016, 1021 (9th Cir.1985) (quoting Tarasoff v. Regents of the University of California, 17 Cal.3d 425, 434, 551 P.2d 334, 342, 131 Cal.Rptr. 14, 22 (1976)). Indeed, whether a duty is owed is "ultimately a question of fairness involving a weighing of the relationship of the parties, the nature of the risk, and the public interest in the proposed solution." Katona v. County of Los Angeles, 172 Cal.App.3d 53, 61, 218 Cal.Rptr. 19, 23 (1985) (citing Totten v. More Oakland Residential Housing, Inc., 63 Cal.App.3d 538, 545, 134 Cal.Rptr. 29, 34 (1976)). "[I]n determining whether 'liability' can be imposed if negligence is proved, the courts are guided by 'history, our continually refined concepts of morals and justice, the convenience of the rule, and social judgment as to where the loss should fall.' " Lopez v. McDonald's, 193 Cal.App.3d 495, 238 Cal.Rptr. 436 (1987) (quoting Weirum v. RKO General, Inc., 15 Cal.3d 40, 46, 123 Cal.Rptr. 468, 539 P.2d 36 (1975)); see also Elam v. College Park Hospital, 132 Cal.App.3d 332 at 340 n. 9, 183 Cal.Rptr. 156 (1982)
 
 
 [3]
 See also Becker v. IRM Corp., 38 Cal.3d 454, 698 P.2d 116, 124, 213 Cal.Rptr. 213, 221 (1985); Isaacs v. Huntington Memorial Hospital, 38 Cal.3d 112, 125-26, 695 P.2d 653, 658, 211 Cal.Rptr. 356, 361 (1985); Sun 'N Sand, Inc. v. United California Bank, 21 Cal.3d 671, 582 P.2d 920, 936, 148 Cal.Rptr. 329, 345 (1978); but c.f. Molsbergen v. United States, 757 F.2d 1016, 1021 (9th Cir.1985) (factors somewhat different)
 We note that in cases where this analysis precludes liability, "society is not intending to foster unreasonable conduct; rather, other policy interests are seen as being adversely affected if defendants conduct and decisions are subject to judicial scrutiny and sanctions." Lopez v. McDonald's, 193 Cal.App.3d 495, 238 Cal.Rptr. 436 (1987); Hucko v. City of San Diego, 179 Cal.App.3d 520, 523, 224 Cal.Rptr. 552, 553 (1986).
 
 
 [4]
 Allen v. Toten, 172 Cal.App.3d 1079, 1087, 218 Cal.Rptr. 725, 730 (1985) (foreseeable injury, but other Rowland factors militate against finding the existence of a "duty"); Bigbee v. Pacific Tel. & Tel. Co., 34 Cal.3d 49, 59 n. 14, 665 P.2d 947, 953 n. 14, 192 Cal.Rptr. 857, 863 n. 14 (1983); Dillon v. Legg, 68 Cal.2d 728, 739, 441 P.2d 912, 69 Cal.Rptr. 72 (1968); see also Clarke v. Hoek, 174 Cal.App.3d 208, 214-15, 219 Cal.Rptr. 845, 849 (1985); Vandermost v. Alpha Beta Co., 164 Cal.App.3d 771, 779, 210 Cal.Rptr. 613, 618 (1985) (Foreseeability is not coterminous with duty-application of other factors precluded a finding of duty); Forrand v. Foodmaker, Inc., 182 Cal.App.3d 196, 200, 227 Cal.Rptr. 74, 76 (1986) (same)
 
 
 [5]
 As the California Supreme Court stated in Peterson v. San Francisco Comm. College District, 36 Cal.3d 799, 809 n. 5, 685 P.2d 1193, 1198 n. 5, 205 Cal.Rptr. 842, 847 n. 5 (1984), "although we no longer adhere to the rigid classifications of duty based on status, plaintiff's status is relevant under certain circumstances to the question of liability." See also Mark v. Pacific Gas & Electric Co., 7 Cal.3d 170, 183, 496 P.2d 1276, 1285, 101 Cal.Rptr. 908, 917 (1972) ("plaintiff's status as a trespasser should be only one of several factors to be weighed by the trier of fact to determine liability"); Rowland v. Christian, 69 Cal.2d 108, 119, 443 P.2d 561, 70 Cal. 97 (1968) ("Although the plaintiff's status as a trespasser, licensee, or invitee may in the light of the facts giving rise to such status have some bearing on the question of liability, the status is not determinative"); see also Alva v. Cook, 49 Cal.App.3d 899, 903, 123 Cal.Rptr. 166 (1975); Beauchamp v. Los Gatos Golf Course, 273 Cal.App.2d 20, 25, 77 Cal.Rptr. 914 (1969)
 Other courts have also considered either the improper or illegal nature of a plaintiff's activities as a factor in determining whether those actions were "foreseeable." Bisetti v. United Refrigeration Corp., 174 Cal.App.3d 643, 651 n. 2, 220 Cal.Rptr. 209, 213 n. 2 (1985) (factor of "foreseeability of harm" is extremely remote, given the illegal nature of plaintiff's activities); Perrine v. Pacific Gas and Electric Co., 186 Cal.App.2d 442, 9 Cal.Rptr. 45, 49 (1960) (Electric Power line owner need not anticipate every circumstance under which someone may make contact with wire causing injury--plaintiff's breach of the California civil code in working to close to power lines made the accident unforeseeable) (pre-Rowland ).
 
 
 [6]
 When shown a photograph of pole 27 (picture A-62), Mr. Nerison testified that there were three high voltage wires dangling from the top of the pole (2 RT 957:24 through 2 RT 958:5). Also, as the government states in its brief, Captain Pringle testified that when he viewed the accident area the day after the accident, there were wires hanging from pole 27. Gov't. Brief p. 14 (citing RT 695 and Exhibit A-62). The government has not taken the position that the wires from pole 27 were cut the night of the accident
 
 
 [7]
 In its brief, the government states:
 Exhibits A-46B and A-54 show lines dangling from poles 20 and 27. Henderson probably did not see the high voltage lines from Poles 25, 26, and 27 were missing because they were not in the foreground of his field of view. Because of the locations of Poles 26 and 27, the presence or absence of the high voltage conductors would not have been evident, except on focused scrutiny, to anyone driving the roads. The relatively concealed positions of those poles may be the reason Harmon started cutting wire there, presumably commencing June 2, his first venture.
 Gov't. Brief p. 44 n. 24. The government earlier stated in its brief that "on June 2, Harmon rented bolt cutters, went to the Facility and cut and removed some wire (probably from Poles 25, 26, and 27), which he brought home and sold. Gov't. Brief p. 10.